THOMAS AND AGNES CARVEL
FOUNDATION, Plaintiff,

v.

Pamela CARVEL and the Carvel
Foundation, Inc.,
Defendants.

Pamela Carvel, Counterclaim and
Third–Party Plaintiff,

v.

Thomas and Agnes Carvel Foundation,
William Griffin, and Kevin Stevens,
Counterclaim and Third–Party–Defen-
dants.

No. 09 Civ. 5083 (JSR).

United States District Court,
S.D. New York.

Aug. 20, 2010.

Joan Marie Magoolaghan, Koob & Magoolaghan, Yonkers, NY, Kevin A. Stevens, Kevin A. Stevens PC, Suffern, NY, for Plaintiff/Counter Defendant.

Pamela Carvel, Wilmington, DE, pro se.

### ORDER

JED S. RAKOFF, District Judge.

On May 7, 2010, the Honorable Michael H. Dolinger, United States Magistrate

Judge, issued a thorough and well-reasoned 107–page Report and Recommendation ("Report") in the above-captioned matter, recommending that: 1) the motion for summary judgment by plaintiff Thomas and Agnes Carvel Foundation ("TAF") be granted; 2) the motion by counterclaim defendants TAF, William Griffin and Kevin Stevens dismissing claims by counterclaim plaintiff Pamela Carvel ("Ms. Carvel") be granted; 3) the motion by Ms. Carvel for sanctions against counterclaim defendants be denied; 4) defendant Carvel Foundation be dismissed from the lawsuit; 5) TAF, Griffin and Stevens be awarded their costs, including reasonable attorneys' fees, as against Ms. Carvel for their defense against her claims; and, finally, 6) that the Court enjoin Ms. Carvel from further, similar court filings as follows:

Pamela Carvel is hereby permanently enjoined from filing any new lawsuit against any defendant in the Southern District of New York that arises from or seeks to affect the disposition of any assets in the custody or control of any fiduciaries of the estates or trusts of Thomas Carvel or Agnes Carvel without first obtaining leave of court in accordance with the following conditions: (1)

(A) Pamela Carvel shall file with the complaint of any new action a motion captioned "Motion Pursuant to Court Order Seeking Leave to File;

(B) Pamela Carvel shall attach, as an exhibit to the motion, a copy of this order;

(C) Pamela Carvel shall also attach, as an exhibit to the motion, an attestation under penalty of perjury that she has

(i) complied with Rule 11 of the Federal Rules of Civil Procedure; and

(ii) has complied with the conditions of this injunction;

(2) Any initial filing that does not include an attestation that complies with the requirements of subdivision (C) shall be summarily dismissed pursuant to the terms of this injunction; and

(3) Any initial filing that does not comply with the terms of this injunction may subject plaintiff to sanctions and/or citation for contempt of court.

On June 10, 2010, Ms. Carvel filed voluminous objections, amplified by numerous exhibits, objecting to the Report "in its entirety."

Accordingly, the Court has reviewed the objections and underlying record *de novo.* Having done so, the Court finds itself in complete agreement with the Report, which the Court hereby adopts by reference.[1] Among other things, this means that the aforesaid injunction takes effect immediately.

The Clerk of the Court is directed to enter final judgment and to close documents 5 and 41 on the docket of this case.

SO ORDERED.

### REPORT & RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate Judge.

TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:

Plaintiff Thomas and Agnes Carvel Foundation (the "TAF"), a New York not-for-profit corporation, commenced this lawsuit in the New York State Supreme Court, New York County, seeking recognition, under N.Y. C.P.L.R. §§ 5303 and 5304, of two money judgments entered in the courts of the United Kingdom against defendant Pamela Carvel. In addition to Ms. Carvel, plaintiff named as a second defendant the so-called Carvel Foundation,

---

1. Items # 5 and # 6 are also warranted under Rule 11, FED. R. CIV. P.

Inc., a not-for-profit Florida corporation that Ms. Carvel had founded.

Ms. Carvel, appearing *pro se,* removed the case to this court based on diversity jurisdiction. She then asserted counterclaims and third-party claims against the TAF as well as against William Griffin, who is the chairman of the TAF (Decl. of Joan Magoolaghan, Esq. in Supp. of Pl.'s Mot. to Dismiss Countercls. and for Sanctions, executed Aug. 28, 2009, ¶ 8 n. 7), and against Kevin Stevens, Esq., who is the attorney representing the TAF on its application for recognition of the United Kingdom judgments.

Plaintiff's initial filing in state court was in the form of a Notice of Motion for Summary Judgment in Lieu of Complaint. Upon removal of the case to this court, the TAF filed a full-blown motion for summary judgment, premised in large part on the papers that it had filed in state court. (*See* Aff. of Kevin A. Stevens, Esq. in Supp. of Pl.'s Mot. for Summ. J., executed July 15, 2009, ¶¶ 1–2 & Ex. A). In addition, the TAF and Messrs. Griffin and Stevens, represented by separate counsel, have moved to dismiss Ms. Carvel's counterclaims and third-party claims. They also seek to impose sanctions on her for bad-faith litigation and to enjoin her from filing further lawsuits on the same topics against the TAF and its representatives. Ms. Carvel has opposed all of these motions and has in turn moved for sanctions against the TAF and Messrs. Griffin and Stevens.

For reasons to be noted, we recommend (1) that the defendant Carvel Foundation, Inc. be dismissed from the case, (2) that the motions of plaintiff the TAF for summary judgment and of the TAF and the third-party defendants for dismissal of Ms. Carvel's claims be granted, (3) that their motion for sanctions be granted in part and (4) that Ms. Carvel be enjoined from pursuing similar litigation against the TAF

and its agents in this court. We also recommend that Ms. Carvel's motion for sanctions be denied.

## I. *A Brief Historical Survey for Context*

To aid in understanding the issues in this case, we summarize certain events concerning the disposition of assets from the estate of Thomas Carvel, including related legal proceedings. In doing so, we make no effort to recount the many twists and turns of the extremely lengthy and complicated history of Pamela Carvel's dealings with the estates of her uncle and aunt and with the TAF, as well as with the numerous individuals drawn into the vortex of estate-related litigation. We instead limit ourselves to the contextual facts most pertinent to the current controversy.

The genesis of this litigation goes back to documents executed in 1988 by ice-cream magnate Thomas Carvel and his wife Agnes Carvel, the uncle and aunt, respectively, of Pamela Carvel. At that time they signed a will contract, which provided for the mutual execution of mirror-image wills, each specifying that, in case of the death of the testator, the assets of the marriage would be placed in a marital trust and provide income for life to the surviving spouse, with the residual assets then being left, on the death of the surviving spouse, to the TAF for charitable uses. Magoolaghan Decl. at ¶ 8; *In re Thomas & Agnes Carvel Found.,* 8 Misc.3d 1025(A), 806 N.Y.S.2d 449, 2002 WL 32872391, *2–3 (Sur. Ct. Westchester County Apr. 1, 2002) (hereafter *"In re TAF ").* The couple executed compliant wills and stock powers at the same time. These documents created a testamentary trust for the benefit of the surviving spouse and named the TAF as the sole beneficiary upon the death of both Carvels. Magoolaghan Decl. at ¶ 8; *In re TAF,*

2002 WL 32872391, at *3; App. to Pamela Carvel's Aff. & Mem. of Law in Opp'n to Mot. to Dismiss Countercls. and for Sanctions ("Carvel Aff. in Opp'n to Dismissal and Sanctions"), executed Sept. 23, 2009, A1–880213TC WILL, at 1, 6–7) (included on submitted compact disc).[1]

Thomas Carvel died in 1990, and the Surrogate's Court of Westchester County took jurisdiction over his estate. *In re TAF*, 2002 WL 32872391, at *3. Under his will, both Agnes Carvel and Pamela Carvel were appointed, with five other individuals, as co-executors of his estate. (App. to Carvel Aff. in Opp'n to Dismissal and Sanctions, A1–880213TC WILL, at 10). They also were appointed as co-trustees of the testamentary trust created by his will. *Id.*

At about that time Agnes Carvel executed a new will in the belief that her original 1988 will had been lost. The new will reflected in substance the same terms as its predecessor, and was thus compliant with the reciprocal agreement between her and her late husband. *In re TAF*, 2002 WL 32872391, at *3; Magoolaghan Decl. at ¶ 10. In 1991 she created a revocable trust, titled the Agnes Carvel 1991 Trust. Under its terms she took a life interest in the trust fund, with the balance bequeathed to the TAF on her death. She later transferred substantial assets into that trust. *In re TAF*, 2002 WL 32872391, at *3; Magoolaghan Decl. at ¶ 10.[2]

In the period between December 1994 and February 2005, Pamela Carvel transferred more than $2 million from the es-

tate of Thomas Carvel into a London account in her own name and that of her aunt, and did so without notice to the other co-executors of the Thomas Carvel estate. (Magoolaghan Decl., Ex. F—*In re Thomas Carvel,* Order at 3 (Sur. Ct. Westchester County July 5, 1995), Ex. G—*In re Thomas Carvel,* Decision at 2–3 (Sur. Ct. Westchester County Feb. 17, 2000)). In 1995 Agnes Carvel moved to the United Kingdom, apparently to live with Pamela Carvel, who already principally resided there. (Magoolaghan Decl. at ¶ 11).[3] In addition, in June 1995 Pamela Carvel obtained appointment by the Florida Circuit Court for Palm Beach, Probate Division, as limited guardian of her aunt's property. (Magoolaghan Decl., Ex. F at 3).

Shortly after the transfer of the $2 million to the London account of Pamela and Agnes Carvel, Pamela's Carvel's co-executor Betty Godley applied to the Surrogate's Court to order a return of these assets to the Thomas Carvel estate. (*Id.,* Ex. G at 3). In the course of that proceeding, the Surrogate suspended Pamela Carvel's roles as co-executor of Thomas Carvel's will and co-trustee of his testamentary trust based *inter alia* on her misconduct in connection with the unauthorized transfer of assets to the London account. (*Id.,* Ex. F at 3–4, Ex. G at 3). The court also found Agnes Carvel to be a person under a disability, and it suspended her as trustee of the testamentary trust created by Thomas Carvel's will, and appointed a guardian *ad litem* for her in her status as a beneficiary under Mr. Carvel's

---

1. In these matching wills, various individuals, including Pamela Carvel, were given specific bequests—in her case $20,000.00—but the only residual beneficiary was the TAF. (App. to Carvel Aff. in Opp'n to Dismissal and Sanctions, A1–880213TC WILL, at 1).

2. The trust was apparently created in Florida. (Magoolaghan Decl. at ¶ 10 n. 9).

3. Pamela Carvel appears to have had residences in London, Florida and New York. (Stevens Aff., Ex. B at p. 4; Decl. of Joan Magoolaghan, Esq. in Reply to Def.'s Opp'n to Mot. to Dismiss Countercls. and for Sanctions, and in Opp'n to Pamela Carvel's Mot. for Sanctions and Treble Damages ("Magoolaghan Reply Decl."), executed Oct. 7, 2009, ¶¶ 9–11).

will. (*Id.*, Ex. F at 2–4, Ex. G at 3). At the same time Agnes Carvel resigned as co-executor of her husband's estate rather than appear for evaluation by the court. (*Id.*, Ex. F at 2–4).

Only two days after the issuance of the Surrogate's order suspending both Pamela and Agnes Carvel as fiduciaries of the estate and trust of Thomas Carvel and appointing a guardian *ad litem* for Agnes Carvel, Pamela's aunt executed a new will, naming her niece as sole executor. Under the terms of the will, she bequeathed her residuary estate to the confusingly named Carvel Foundation, a Florida not-for-profit corporation of which Pamela Carvel was the founding director (hereafter "the Florida Foundation"). *In re TAF*, 2002 WL 32872391, at *4; App. to Carvel Aff. in Opp'n to Dismissal and Sanctions, A8–950707–AGNES CARVEL PROBATED WILL, 4; Magoolaghan Decl. at ¶ 11. In substance, this will purported to change the residual beneficiary from the TAF—as specified in the will contract between Agnes and Thomas Carvel—to a corporation apparently controlled by Pamela Carvel.

Agnes Carvel died in August 1998 at the approximate age of 90. Pamela Carvel then probated the 1995 will in the High Court of Justice, Chancery Division, in London and was appointed by that court the sole personal representative of her aunt's estate. *In re TAF*, 2002 WL 32872391, at *4. She undertook this proceeding without any notice to the TAF. (Magoolaghan Decl. at ¶ 12).

Subsequently, Ms. Carvel and the TAF have been embroiled in a vast array of estate-related litigation in New York, Flor-

ida, Delaware and the United Kingdom. As immediately relevant, upon the death of Agnes Carvel the TAF commenced a proceeding in 1998 in the Westchester County Surrogate's Court to enforce the will contract between Agnes and Thomas Carvel. In that proceeding, in which Pamela Carvel participated, the Agnes Carvel estate was represented by Leonard Ross, Esq., a New York attorney who had previously represented Agnes Carvel and who was appointed by the court as New York ancillary administrator of the Agnes Carvel estate. *Thomas & Agnes Carvel Found. v. Carvel*, 2007 WL 1623233, [2007] EWHC 1314(Ch.), [2008] Ch. 395, 400 ¶¶ 9–10 [4] (hereafter *"TAF v. PC"*).[5] On April 1, 2002, after a trial at which Ms. Carvel appeared and testified, the Westchester County Surrogate found that the 1995 Agnes Carvel will had violated the terms of the 1988 will contract between Agnes and Thomas Carvel, and he held that the TAF was entitled to the residual assets of the Agnes Carvel estate. *In re TAF*, 2002 WL 32872391, at *3–4, *9–10. The Appellate Division affirmed that decision in 2003. *In re Carvel*, 2 A.D.3d 847, 848, 769 N.Y.S.2d 402, 402–03 (2d Dep't 2003).

In the meantime, on June 13, 2003 Pamela Carvel filed a lawsuit in her own name in the Chancery Division of the High Court of Justice in London, suing herself as executor of the Agnes Carvel estate and claiming that the estate owed her personally £6, 640, 897.79, together with accrued interest of £1, 148, 827. 90. *See TAF v. PC*, [2008] Ch. at 400 ¶ 11. In commencing this proceeding, she gave no notice to the TAF or to any fiduciaries of the Thomas Carvel estate. *Id.* at 401 ¶ 14, 769

---

**4.** A copy of the cited High Court decision is annexed to the Magoolaghan Declaration as Exhibit E.

**5.** Ms. Carvel could not appear directly as representative of the estate because she was a

foreign fiduciary. She was, however, a party to the proceeding in her personal capacity and also as trustee of the Realities Trust, an entity to which estate property had been transferred and to which the TAF claimed title. *TAF v. PC*, [2008] Ch. at 400 ¶ 10.

N.Y.S.2d 402; Magoolaghan Decl., Ex. M—*In re Recognition of Foreign Judgment: Carvel v. Estate of Agnes Carvel,* Order at 2 (Fla. 17th Cir.Ct. Jan. 31, 2006). She also did not mention to the High Court that the 1995 will appointing her as executor had been set aside by the Westchester Surrogate. *See TAF v. PC,* [2008] Ch. at 409 ¶ 48.

The High Court substituted Pamela's creation, the Florida Foundation, as the defendant representing the Agnes Carvel estate—presumably because the Florida Foundation was the sole beneficiary of the 1995 will—and that foundation then conceded the purported debt to Ms. Carvel and admitted liability. *TAF v. PC,* [2008] Ch. at 400–01 ¶ 12.[6] In the absence of any opposition, on January 8, 2004 the High Court entered judgment for Ms. Carvel and against her aunt's estate for £8,085,095.51 plus costs. *Id..*[7]

With judgment in hand, on April 14, 2005 Ms. Carvel proceeded to Florida state court—the state in which her Florida Foundation was domiciled—asking the Florida Circuit Court for Broward County to domesticate the judgment entered by the High Court (hereafter "the Chancery judgment"). *Id.,* [2008] Ch. at 401 ¶ 13; Magoolaghan Decl., Ex. M at 3. Again, she gave no notice to the TAF of this filing. *TAF v. PC,* [2008] Ch. at 401 ¶ 14; Magoolaghan Decl., Ex. M at 3. By order dated May 10, 2005, the Circuit Court directed that the Chancery judgment be entered as a judgment in Florida. Magoolaghan Decl., Ex. M at 3; *TAF v. PC,* [2008] Ch. at 401 ¶ 13.

Moving swiftly, Pamela Carvel registered the Florida domestication order with the New York State Supreme Court for Nassau County on August 26, 2005. *TAF v. PC,* [2008] Ch. at 401 ¶ 15. (*See also* Magoolaghan Decl., Ex. N—*Carvel v. Estate of Carvel,* Order dated Jan. 25, 2006, 2). This step presumably reflected an effort to avoid the Westchester Surrogate's Court, in which Thomas Carvel's will had been probated and in which the court had already determined in 2002 that the 1995 Agnes Carvel will was invalid and that the TAF was entitled to the residual assets of her estate. On August 29, 2005 Pamela Carvel obtained a writ of execution from the Nassau County Supreme Court in the amount of $15,929,214.15 and arranged for its service on the Bank of New York and the firm of Edward Jones, which collectively held estate assets in excess of nine million dollars. *TAF v. PC,* [2008] Ch. at 401 ¶ 16. Both entities refused, however, to surrender the assets without a turnover order, and so Ms. Carvel petitioned the Nassau County Supreme Court for such an order, misleadingly claiming that the estate of Agnes Carvel had received notice and did not oppose, all again without notice to the TAF or Mr. Ross, the appointed New York representative of the Agnes Carvel estate. *Id..*

This apparent scheme to seize the Agnes Carvel estate assets stalled, however, when Mr. Ross and the TAF, alerted to Ms. Carvel's efforts, successfully applied to the Nassau County Supreme Court to issue a temporary restraining order, on December 29, 2005, barring Ms. Carvel from enforcing the Chancery judgment. *Id.* at 401 ¶ 17.[8] On the same day the Surro-

---

**6.** The concession of liability was signed by Linda Carvel, Pamela Carvel's mother. *Id.*

**7.** On May 6, 2004 the High Court amended the judgement to state expressly that the award was to be paid from Agnes Carvel's estate upon the Florida Foundation's consent

"as residuary beneficiary appointed to represent the said estate." *Id.*

**8.** The court later transferred the proceeding to the Surrogate's Court. (Magoolaghan Decl. at ¶ 20 & Ex. N).

gate's Court in Westchester issued a parallel temporary restraining order. *TAF v. PC*, [2008] Ch. at 401 ¶ 17.[9]

The next day the TAF intervened in the Broward County proceeding in Florida and obtained a stay of the domestication order on January 10, 2006. *TAF v. PC*, [2008] Ch. at 401 ¶ 17. The Florida court then vacated the domestication order on January 31, 2006, finding "strong evidence of a fraud upon the court perpetrated by [Pamela Carvel] in both the proceedings before the High Court and this Court." *Id.;* Magoolaghan Decl. at ¶ 16 & Ex. M at 5.

Seemingly undeterred, Ms. Carvel moved on January 20, 2006 in the United States District Court for the Eastern District of New York to confirm the Chancery judgment and to enforce it against the Agnes Carvel estate. In doing so, she named as defendant only the Florida Foundation and did not mention the state-court restraining orders or the Florida court's vacatur of the original judgment registration, nor did she give notice to the TAF or to Mr. Ross, as the appointed New York representative for the Agnes Carvel estate. *TAF v. PC*, [2008] Ch. at 401–02 ¶ 17; Magoolaghan Decl., Ex O at 15–16, Ex. I at 5). The District Court finally dismissed her application on March 29, 2006, holding that it was barred by the probate exception to diversity jurisdiction and finding that Ms. Carvel was attempting to perpetrate the same fraud on the

court as she had in the United Kingdom and in Florida. (Magoolaghan Decl., Ex. I at 5–7). Ms. Carvel appealed that decision to the Second Circuit, which affirmed. *Carvel v. Carvel Found., Inc.*, 230 Fed. Appx. 103, 103–04 (2d Cir.2007).

The TAF turned to the High Court in London in August 2006, seeking to replace Pamela Carvel as the sole personal representative of the Agnes Carvel estate, and to substitute a neutral independent professional representative. Naming both Ms. Carvel and the Florida Foundation as defendants, the TAF also sought vacatur of the 2003 Chancery judgment, which had awarded the Ms. Carvel more than £8 million against the Agnes Carvel estate. Eventually the High Court granted both forms of requested relief to the TAF, *TAF v. PC*, [2008] Ch. at 409–11 ¶¶ 48–58, and it subsequently issued two cost judgments against Ms. Carvel as the losing party. (Aff. of Rupert Ticehurst, Esq. in Supp. of Mot. for Summ. J. in Lieu of Compl., executed Apr. 17, 2009, Exs. I, K, L). These cost judgments are the subject of the TAF's current application here for recognition.

Finally, we note that Ms. Carvel has pursued a somewhat similar path in the State of Delaware. In 2003—after the decision of the Westchester Surrogate invalidating the 1995 will of her aunt—she petitioned the New Castle County Register of Wills for authority to appear as

---

**9.** The Surrogate's Court order, which apparently was still in place at least as recently as 2006 (Magoolaghan Decl., Ex. I—*Carvel v. Carvel Found. Inc.*, Mem. and Order (E.D.N.Y. Mar. 29, 2006), 5), prohibited Ms. Carvel from

(1) taking any action in another court pertaining to or affecting the assets and property of the Estate [of Agnes Carvel], subject to the jurisdiction of this Court, including all assets and property of said Estate that are located in the State of New York, (b) taking any action to enforce the purported

Judgment obtained by Pamela Carvel with regard to assets and property of the Estate [of Agnes Carvel], or (c) taking any action which interferes with Ross' possession, custody and control of the funds, assets or property of the Estate recovered by him or over which he has custody or control for the benefit of the Estate and/or (d) from representing to any entity that she has legal authority to act on behalf of the Estate in the State of New York.

(*See id.*, Ex. I at 5–6).

ancillary personal representative of the Agnes Carvel estate in Delaware. In support of that application, she presented the previously invalidated 1995 will. Moreover, her application did not list the TAF as a beneficiary of the estate and did not mention the proceedings in, or rulings of, the Westchester Surrogate, particularly his ruling that the TAF was the legitimate residual beneficiary of that estate. In this state of affairs, the Register granted Ms. Carvel's application. *See Thomas & Agnes Carvel Found. v. Carvel*, 2008 WL 4482703, *2, *7 (Del.Ch. Sept. 30, 2008), *aff'd*, 970 A.2d 256, 2009 WL 714958 (Del. Mar. 19, 2009). Having been appointed, Ms. Carvel made several belated inventory filings but did not list the TAF as beneficiary of the Agnes Carvel estate, and she apparently took no steps to assemble the Delaware assets of the estate. *Id.*, 2008 WL 4482703, at *10.

In the wake of the 2007 decision of the High Court of Justice vacating the Chancery judgment, the TAF petitioned the Delaware Court of Chancery to remove Ms. Carvel as Delaware ancillary administrator of the Agnes Carvel estate. In opposing this application, Ms. Carvel argued *inter alia* that the TAF lacked standing because it was not the real Carvel foundation [10] and that any prior decision of the Surrogate's Court should be ignored as it was the result of bribery of the court. *Id.* at *3, *9. Rejecting the first argument based on prior findings of the Westchester Surrogate's Court and the Florida Circuit Court for Broward County, and dismissing the second as meritless, the Delaware

Chancery Court granted the TAF's application to remove Ms. Carvel as ancillary administrator based on her violation of her fiduciary duties, all stemming from her demonstrated hostility towards the TAF, which the court recognized as the legitimate residual beneficiary of the Agnes Carvel estate. *Id.* at *6, *9, *11. She appealed that decision, but the Delaware Supreme Court affirmed in 2009. *Carvel v. Thomas & Agnes Carvel Found.*, 970 A.2d 256, 2009 WL 714958 (Del. Mar. 19, 2009).[11]

## II. *Procedural Issues: The Status of the Florida Foundation*

Before addressing the various motions that the litigants have offered for our consideration, we turn to two, ultimately related, procedural issues, one of which the parties have not mentioned and the other of which has been raised only by defendant Pamela Carvel. The first concerns the unanimity requirement for removal of cases from state court and the other involves the status of the defendant Florida Foundation, which is not represented by an attorney in this lawsuit and indeed has not appeared at all.

 The federal removal statute authorizes the defendant or defendants in a state-court lawsuit to remove the case to federal court if, *inter alia*, the federal court would have original subject-matter jurisdiction over the suit, including, as in this case, jurisdiction based on complete diversity. 28 U.S.C. § 1441(a). *See Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 92 (2d Cir.2010); *Bounds v. Pine Belt Mental*

---

**10.** As in other courts, she contended that her own Florida Foundation was the proper inheritor of the Carvel estate assets. *Id.* at *4, 6 & n. 48 (discussing Pamela Carvel's contention that she is the sole legitimate member of the Foundation).

**11.** Ms. Carvel has filed numerous other lawsuits that were related to these issues or that

simply sought to press claims against the assets of her aunt's estate. We do not detail these here, although many of them are mentioned below in connection with the sanctions issue. *See infra* at pp. 768–69 & n. 36. For present purposes, we note only that she has been universally unsuccessful in her many endeavors to get her hands on the estate assets.

*Health Care Res.*, 593 F.3d 209, 215 (2d Cir.2010). In a multi-defendant case, however, the defendant seeking removal must obtain the consent of all other defendants and document that consent in its moving papers. *See, e.g., Heller v. New York City Health & Hosps. Corp.*, 2010 WL 481336, *2 (S.D.N.Y. Feb. 1, 2010) (citing cases). Failure to do so amounts to a procedural defect in the removal process and justifies a remand by the federal court. *Allstate Ins. Co. v. Zhigun*, 2004 WL 187147, *2–3 (S.D.N.Y. Jan. 30, 2004); *Ell v. S.E.T. Landscape Design, Inc.*, 34 F.Supp.2d 188, 193–94 (S.D.N.Y.1999). The primary exception to this requirement is if the remaining defendants are only "nominal", *Heller*, 2010 WL 481336 at *2, a status that apparently reflects that they do not have any interest in the outcome of the case. *E.g., id.* at *3 (quoting *Novovic v. Greyhound Lines, Inc.*, 2008 WL 5000228, *3 (S.D.N.Y. Nov. 19, 2008)).

In this case we note that the removal was accomplished explicitly and solely by defendant Pamela Carvel. Moreover, there is no indication in her removal papers that she obtained the consent of her co-defendant Carvel Foundation, although it appears that she established this foundation, and we infer that she may have practical control over it. Though plaintiff has not addressed this issue, it appears that the foundation is at best a nominal defendant here, since, although it was a defendant in the United Kingdom proceeding, the two cost judgments at issue here were entered only against Ms. Carvel.[12] Hence its consent was not required for removal.

The remaining issue concerns the appropriate disposition of the Florida Foundation as a party here. The foundation is a corporation located in Florida. (*See* Ticehurst Aff., Exs. C & D). Because of its corporate status, the foundation cannot appear in this case on a *pro se* basis. *See, e.g., Lattanzio v. COMTA*, 481 F.3d 137, 139–40 (2d Cir.2007) (citing cases); *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir.1991). *See also Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–02, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). *Accord Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir.2010) (noting that non-lawyer litigant can represent only himself because of high risk that untrained advocate will inadvertently waive or abandon an issue while navigating the "esoteric pitfalls" of the law). To date, however, it has not filed any appearance by counsel; indeed, it has not appeared at all. The papers submitted in opposition to plaintiff's claims and its summary-judgment motion are all in the name of only Pamela Carvel, the foundation's co-defendant. Similarly, only Ms. Carvel has asserted counterclaims and third-party claims. Moreover, Ms. Carvel—who is apparently not a licensed attorney-has represented that she is appearing in this case on a *pro se* basis because she lacks the funds to hire counsel. (Stevens Aff., Ex. B—Def.'s Notice of Removal from State Court at 4; Def.'s Answer at p. 1).

While these circumstances suggest that the Florida Foundation cannot proceed with a defense in this case, Ms. Carvel has requested informally that the proceeding be dismissed against the foundation since it was not named in the cost judgments for which the TAF seeks recognition. (Aug. 1, 2009 letter to the Court from Pamela Carvel).[13] Plaintiff did not respond to that

---

**12.** We assume that the Florida Foundation was included as a defendant in the TAF's United Kingdom application by virtue of its status as the substituted defendant in the 2003 United Kingdom collection proceeding begun by Ms. Carvel and its status as the sole beneficiary of the 1995 Agnes Carvel will.

**13.** We note that Ms. Carvel's request may have been triggered by our July 7, 2009 order stating that if the Florida Foundation did not

application, and we see no legitimate basis to oppose the request. Accordingly we recommend that the Carvel Foundation be dismissed as a defendant.

### III. *The Jurisdictional Issue*

■ We also address a jurisdictional issue not mentioned by the parties because we are required to examine our jurisdiction *sua sponte*. *See, e.g., Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 298 (2d Cir.2009). We do so here solely to confirm that this proceeding is not barred in federal court under the probate exception to diversity jurisdiction. In that regard we note that the exception is limited to proceedings that would require the federal court to exercise authority that is assigned exclusively to the state probate court, that is, the probating or annulment of a will, the administration of an estate and the disposition of property that is in the custody of a probate court or the fiduciary of an estate. *See, e.g., Marshall v. Marshall*, 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006); *Lefkowitz v. Bank of New York*, 528 F.3d 102, 106 (2d Cir.2007). Thus, for example, in a related judgment-recognition and enforcement case brought by defendant Pamela Carvel—seeking recognition and enforcement of the 2003 Chancery judgment—the Second Circuit recently concluded that the exception barred suit in federal court because the relief sought involved disposition of estate property. *Carvel v. Carvel Found., Inc.*, 230 Fed.Appx. 103, 103–04 (2d Cir.2007).[14]

■ In this case, however, the judgments that plaintiff seeks to enforce embody only a monetary award against Ms. Carvel based on her performance in a litigation that the TAF successfully pursued to obtain her removal as the United Kingdom executrix of her aunt's 1995 will and the vacatur of the judgment that she had obtained in 2003 against the Agnes Carvel estate. To enforce or otherwise assess such an award does not trench upon the exclusive functions of a probate court, and hence the probate limitation on diversity jurisdiction does not apply here. *See, e.g., Lefkowitz*, 528 F.3d at 108.

As for Ms. Carvel's counterclaims and third-party claims, some appear to sound in tort and demand compensatory damages from a number of parties that have been involved in estate-related litigation against her. To that extent, these claims are also not barred by the probate exception. *E.g., Lefkowitz*, 528 F.3d at 107–08. As we note, however, in addressing the motion to dismiss all of Ms. Carvel's claims, several of those claims are worded in such a manner as to trigger the probate exception, and as to these we recommend below that they be dismissed on that basis as well as on other grounds. *See* pp. 760–61, 763–64, *infra.*

### IV. *Plaintiff's Summary–Judgment Motion*

The TAF seeks summary judgment on its application for recognition of the two United Kingdom cost judgments against Ms. Carvel. Those judgments, rendered initially in the High Court of Justice, Chancery Division, awarded the TAF an aggregate amount of £185,472.13 in litigation expenses generated by Ms. Carvel's resistance to the TAF's application in that court to replace her as the United Kingdom executrix of the estate of Agnes Carv-

---

appear through counsel by August 7, 2009 it would face the entry of a default judgment. (Order dated July 7, 2009).

**14.** That appeal was from the Eastern District decision dismissing Pamela Carvel's attempt to register and enforce the 2003 Chancery judgment against the Agnes Carvel estate. (*See* Magoolaghan Decl., Ex. I).

el and to vacate the 2003 Chancery judgment obtained by her against that estate.

A. *Summary–Judgment Standards*

Before addressing plaintiff's summary-judgment motion, we summarize the pertinent standards for assessing such a motion. The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir.2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Shade v. Hous. Auth. of the City of New Haven*, 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986); *see, e.g., Ricci v. DeStefano*, —— U.S. ——, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Howley v. Town of Stratford*, 217 F.3d 141, 150–51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *see, e.g., Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex*, 477 U.S. at 322–23, 325, 106 S.Ct. 2548; *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet its initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. *See, e.g., Beard v. Banks*, 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir.2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed.R.Civ.P. 56(e); *see, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 59–60 (2d Cir. 2004), nor can she rely on her pleadings or on merely conclusory factual allegations. *See, e.g., Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000). She must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Woodman v. WWOR–TV, Inc.*, 411 F.3d

69, 75 (2d Cir.2005). Rather, she must present specific evidence in support of her contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

### B. *Assessment of Plaintiff's Motion*

### 1. *The Statutory Framework*

Article 53 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") defines the circumstances under which New York courts will recognize foreign-country judgments. It codifies pre-existing case law authority, and was enacted mainly to encourage foreign courts to recognize New York judgments. *See* N.Y. C.P.L.R. § 5301, David D. Siegel, *Practice Commentaries* C5301:1 at 540 (McKinney's 1997) (citing 13th Jud. Conf. Rep. 194, 195 (1968)). As characterized by the pertinent practice commentaries, "[s]o liberal has New York caselaw been in the recognition of the judgments of foreign nations, in fact, that the occasion to use Article 53 has been rare." *Id.* at 540. *See also* N.Y. C.P.L.R. § 5307 (Article 53 is not exclusive; enforcement may be granted in situations not covered by statute).

Article 53, which is titled the "Uniform Foreign Country Money–Judgments Recognition Act", *see* N.Y. C.P.L.R. § 5309, applies to any foreign country judgment that is "final, conclusive and enforceable where rendered". N.Y. C.P.L.R. § 5302. It provides that, absent circumstances that are specified in section 5304, such a judgment, insofar as it awards a sum of money, "is conclusive" and may be ordered recognized *inter alia* pursuant to a summary-judgment motion in lieu of a complaint. N.Y. C.P.L.R. § 5303.

Section 5304 specifies ten potential exceptions to recognition. Two mandate non-recognition, and the other eight leave the court with discretion not to recognize the judgment. The circumstances that mandate non-recognition are the following:

1. [T]he judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

2. [T]he foreign court did not have personal jurisdiction over the defendant.

N.Y. C.P.L.R. § 5304(a).[15] As for the circumstances that permit discretionary non-recognition, they include:

1. [T]he foreign court did not have jurisdiction over the subject matter;

---

**15.** The lack-of-personal-jurisdiction provision is greatly narrowed by section 5305, which specifies that the judgment is not to be denied recognition for lack of jurisdiction if:

1. [T]he defendant was served personally in the foreign state;
2. [T]he defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure in the proceedings or of contesting the jurisdiction of the court over him;
3. [T]he defendant prior to commencement of the proceedings had agreed to submit to the jurisdiction of the foreign court with respect to the subject matter involved;
4. [T]he defendant was domiciled in the foreign state when the proceedings were instituted, or, being a body corporate, had its principal place of business, was incorporated, or had otherwise acquired corporate status, in the foreign state;
5. [T]he defendant had a business office in the foreign state and the proceedings in the foreign court involved a cause of action arising out of business done by the defendant through that office in the foreign state; or
6. [T]he defendant operated a motor vehicle or airplane in the foreign state and the proceedings involved a cause of action arising out of such operation.

N.Y. C.P.L.R. 5305(a). This section also provides that the court may, in its discretion, "recognize other bases of jurisdiction." *Id.* at § 5305(b).

2. [T]he defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;

3. [T]he judgment was obtained by fraud;

4. [T]he cause of action on which the judgment is based is repugnant to the public policy of this state;

5. [T]he judgment conflicts with another final and conclusive judgment;

6. [T]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court;

7. [I]n the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action; or

8. [T]he cause of action resulted in a defamation judgment obtained in a jurisdiction outside the United States, unless the court before which the matter is brought sitting in this state first determines that the defamation law applied in the foreign court's adjudication provided at least as much protection for freedom of speech and press in that case as would be provided by both the United States and New York constitutions.

N.Y. C.P.L.R. § 5304(b).

### 2. *The Pertinent Facts*

The circumstances of the United Kingdom proceeding are not in genuine dispute and are fully summarized and documented in an affidavit by the attorney who represented the TAF in that case. (Ticehurst Aff. at ¶ 1). We briefly review them here.

The litigation was commenced by the TAF on August 30, 2006 in the High Court of Justice, Chancery Division, and it named as defendants both Pamela Carvel and the Florida Foundation. Plaintiff sought, among other relief, an order removing Ms. Carvel as United Kingdom executrix of the estate of Agnes Carvel under her 1995 will, based on serious misconduct by her involving the diversion of estate assets. This application was accompanied by a request for vacatur of the prior Chancery judgment awarding Ms. Carvel more than £8 million from the estate, and for a declaration that the TAF is entitled to the net assets of the estate. (*Id.* at ¶ 2 & Ex. A).[16]

Consistent with the requirements of the High Court rules of procedure, the TAF served its claim form and a set of witness statements on Ms. Carvel by first class mail in London on August 30, 2006. (Ticehurst Aff. at ¶ 3 & Ex. A). She confirmed service on her by an acknowledgment dated September 15, 2006. (*Id.* at ¶ 4 & Ex. B). She then filed her witness statements on October 13, 2006. (*Id.* at ¶ 4). Plaintiff also served the Florida Foundation in person in Florida on October 4, 2006. (*Id.* at ¶ 5 & Ex. C).[17] Although not formally acknowledging service, the foundation sent

---

**16.** As already briefly noted, the High Court proceeding was preceded by lengthy litigation in the Westchester County Surrogate's Court and numerous other courts in this country that related, in one form or another, to the disposition of the assets of the Agnes Carvel estate. We describe that history in more detail below, when addressing the dismissal and sanctions motions of the TAF and Messrs. Stevens and Griffin. In brief, the Surrogate's Court determined in 2002 that, pursuant to a 1988 will contract between Agnes and Thomas Carvel, the residual assets of Agnes Carv-el's estate must go to the TAF and not to Pamela Carvel, *In re TAF*, 2002 WL 32872391, at *9–10, *aff'd* 2 A.D.3d at 848, 769 N.Y.S.2d at 402–03, a conclusion that Ms. Carvel has repeatedly contested in various fora and also sought to evade. *See* pp. 767–69 & n. 36, *infra.*

**17.** Apparently the address at which the Florida Foundation was registered was a "Mail Boxes Etc." retail location, and so service was made on an employee of Mail Boxes Etc.. (*Id.,* Ex. C).

the High Court a letter admitting that it had been served (*id.* at ¶ 5 & Ex. D), and it consented to the court's jurisdiction and participated in the lawsuit. (*Id.* at ¶ 5).

On November 8, 2006, the TAF moved for summary judgment. Ms. Carvel opposed, and both defendants appeared through counsel at a hearing on the motion on May 23 and 24, 2007. (*Id.* at ¶ 6). By decision dated June 11, 2007, Mr. Justice Lewison granted the TAF's motion insofar as it sought an order that Ms. Carvel be removed as executrix of the estate and that the prior Chancery judgment be vacated. (*Id.*, Ex. E at 9–11—*TAF v. PC*, [2008] Ch. at 409–11 ¶¶ 48–58).[18] By separate order issued the same day, Justice Lewison directed *inter alia* that the TAF be awarded its costs of the action, to be paid by Ms. Carvel, and he referred that matter to a costs judge for assessment. (Ticehurst Aff. at ¶ 6 & Ex. F at ¶ 14). The order also directed that Ms. Carvel pay the TAF, by October 1, 2007, the sum of £100,000 on account of those costs, with that amount to be credited against the ultimate cost award. (*Id.* at ¶ 6 & Ex. F at ¶ 15). Finally, the court denied Ms. Carvel's application for leave to appeal to the Court of Appeal and set July 16, 2007 as the deadline for her to apply to that higher court for leave to appeal. (*Id.* at ¶ 6 & Ex. F at ¶¶ 17–18).

Ms. Carvel applied to the Court of Appeal for leave to appeal the High Court decision. The Court of Appeal denied her application on October 2, 2007. (*Id.* at ¶ 6 & Ex. G). She renewed her application to appeal the decision at an appearance at the Court of Appeal, but the court again denied her request. (*Id.* at ¶ 6 & Ex. H). As a result, the decision of Justice Lewison is no longer subject to appeal. (*Id.* at ¶ 6).

Ms. Carvel failed to comply with the court's directive that she pay the TAF £100,000 in costs by October 1, 2007. (*Id.* at ¶ 7). On December 18, 2007 the TAF mailed her its notice of commencement of an assessment of its costs. (*Id.*). She served her opposition to the proposed bill of costs on January 7, 2008, and the TAF replied on January 24, 2008. (*Id.*).

Following the filing of the TAF's request for a detailed cost assessment, a hearing took place before a cost judge, Master Rogers, on June 3, 2008. Ms. Carvel attended in a *pro se* capacity. (*Id.* at ¶ 8). By order dated June 17, 2008, Master Rogers determined the TAF's total recoverable costs to be £177,222.13, inclusive of the previously ordered payment of £100,000, and he ordered that Ms. Carvel pay that sum within fourteen days. (*Id.* at ¶ 8 & Ex. I). Under the Judgments Act, 1838, 2 Vict., c. 110, § 17 (U.K.), interest on this sum accrues at a rate of 8 percent per annum from the date of Justice Lewison's order. (Ticehurst Aff. at ¶ 8).

On June 23, 2008, Ms. Carvel applied to the High Court for a stay of all orders and judgments against her. (*Id.* at ¶ 9 & Ex. J). The court (by Deputy Master Farrington) dismissed the application by order dated August 13, 2008 and assessed additional costs of £8,250 against her. (*Id.* at ¶ 9 & Ex. K). The statutory time for compliance with that order was fourteen days. (*Id.* at ¶ 9).

On September 12, 2008 the court (by Deputy Master Lloyd) modified the prior cost order in one minor respect, eliminating a reference to the value added tax, since the TAF does not pay such a tax. (*Id.* at ¶ 10 & Ex. L). The TAF communicated this order to Ms. Carvel on September 15, 2008 (*id.* at ¶ 10 & Ex. M), but she has never complied with the amended or-

---

**18.** At the same time, the court appointed Guy Greenhous, Esq., an English solicitor, as the sole personal representative or judicial trustee of the estate of Agnes Carvel with specific reference to her 1995 will. (*Id.*, [2008] Ch. at 411 ¶ 55; Ticehurst Aff., Ex. A).

der. (*Id.* at ¶ 11). As a result, interest on that award has been accruing since August 13, 2008 at 8 percent per annum. (*Id.*).

### 3. *Assessment of Plaintiff's Motion*

■ Plaintiff's submissions amply, and without triable dispute, satisfy the prerequisites of N.Y. C.P.L.R. Article 53 for recognition of a foreign judgment. We address each statutory requirement in turn.

#### i. *Mandatory Criteria*

##### (a) *"Final, conclusive and enforceable" money judgment*

The two money judgments that were issued against Ms. Carvel to impose the prevailing party's costs on her as a losing litigant are final and enforceable. As noted, Ms. Carvel was refused permission to appeal to the Court of Appeal the June 11, 2007 order, which, *inter alia*, required her to pay the TAF's costs, and that order is now unappealable. (Ticehurst Aff. at ¶ 6). Moreover, Ms. Carvel's attempt to stay the enforcement of this judgment was denied, and therefore the judgment is enforceable. (*See id.* at ¶ 9). Likewise, Ms. Carvel did not apply to vary the August 13, 2008 cost order within 14 days after she was served with the modified order, and that order is therefore also final and enforceable. (*See id.* at ¶ 10).

##### (b) *"Impartial Tribunal" and "Compatible Procedures"*

There is no question that the two cost judgments were entered against Ms. Carvel by a court of competent jurisdiction in the United Kingdom. Moreover, the judicial system in England has long been recognized as providing "impartial tribunals" and "procedures compatible with the requirements of due process of law". N.Y. C.P.L.R. § 5304(a). *See, e.g., CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.,*

100 N.Y.2d 215, 222, 762 N.Y.S.2d 5, 10, 792 N.E.2d 155 (2003) (citing N.Y. C.P.L.R. § 5304, David D. Siegel, Practice Commentaries C5304:1 at 65 (McKinney's 2003 Pocket Pt.)). Indeed, the notion that the English judicial system might not qualify has been described as "border[ing] on the risible." *Tropp v. Corp. of Lloyd's,* 2008 WL 5758763, *14 (S.D.N.Y. Mar. 26, 2008) (quoting *inter alia Soc'y of Lloyd's v. Ashenden,* 233 F.3d 473, 476 (7th Cir. 2000)).

#### (c) *Personal Jurisdiction*

As for personal jurisdiction, the documentary record conclusively demonstrates that the High Court had jurisdiction over Ms. Carvel. She concedes that in her capacity as executor of her aunt's estate, she is a citizen of the United Kingdom. (*See* Stevens Aff., Ex. B—Notice of Removal at ¶ 4). Moreover, she was served at her designated London address—28 Old Brompton Road, Suite 158–when the TAF filed suit. (Ticehurst Aff. at ¶ 3). Indeed, she has long and consistently demanded that she be served at that address even in cases pending in the United States. (*See* Def.'s R. 56.1 Resp. at fifth page ¶ 2(c) & Ex. D; Supplemental Aff. of Victoria Sweeting, Esq., executed June 9, 2009, ¶ 5)). This alone is sufficient under the statute to preclude a challenge by Ms. Carvel to the foreign court's jurisdiction. N.Y. C.P.L.R. § 5305(a)(4). She also conceded in writing that she had been served, she contested the substance of the plaintiff's claims in that proceeding, and she even personally appeared in court to pursue her defenses and attempted appeal. (Ticehurst Aff. at ¶¶ 4, 6–9 & Exs. B, H, J). Again, all of the facts independently demonstrate conclusively, under N.Y. C.P.L.R. § 5305(a), that the High Court of Justice had personal jurisdiction over her. *See* N.Y. C.P.L.R. §§ 5305(1) & (2).[19]

---

**19.** To the extent that Ms. Carvel suggests that the New York State Supreme Court, in which

## ii. *Discretionary Criteria*

None of the other, discretionary, factors that may justify a court in declining to recognize a foreign judgment suggests a different result here. Ms. Carvel simply makes no showing that would permit their invocation even if the court were so inclined.

### (a) *Subject–Matter Jurisdiction*

There is no suggestion in the record that the High Court lacked subject-matter jurisdiction over the case. Indeed, we note that Ms. Carvel herself probated her aunt's will in that court, and then pursued litigation there on her purported claims against her aunt's estate and initially obtained a large judgment that she then sought to register and enforce in this country. *TAF v. PC*, [2008] Ch. at 399 ¶ 7, 340 ¶ 11.[20] It was both her status as executor of her aunt's 1995 will and the entry of the Chancery judgment against her aunt's estate that triggered the TAF application in the same court. Moreover, the High Court determined that it had jurisdiction over the TAF's claim under the Judicial Trustees Act, 1896, 50 Vict., c. 35, § 1 (U.K.) which, *inter alia,* authorizes the court to replace all or any existing trustees of a trust if sufficient cause is shown for doing so by a beneficiary of the trust. *TAF v. PC*, [2008] Ch. at 402–03 ¶ 20, 404–06 ¶¶ 28–32.

### (b) *Adequacy of Notice*

There is also no question that Ms. Carvel received adequate notice of the proceeding commenced in the High Court by the TAF; indeed, she acknowledged such notice, was represented by counsel throughout the process, submitted witness statements on her own behalf and participated in the hearing that led to the adverse judgments—a hearing that took place many months after plaintiff's initial filing. (*See* Ticehurst Aff. at ¶¶ 4, 6). Moreover, there is nothing in the record suggesting that she ever complained that she needed more time before the hearing at issue was conducted by the High Court.

### (c) *Fraud on the Court*

Defendant also fails to create a triable issue on her contention that the result of the High Court proceeding was obtained by fraud. Although Ms. Carvel uses the terms "fraud", "fraudulent" and "fraudster" rather liberally in her narrative (*e.g.,* Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶¶ 37, 54–55; Def.'s R. 56.1 Resp. at p. 2 ¶ 5, p. 4 ¶ 1(b); Def.'s Answer at ¶¶ 8, 10, 11, 13, 22, 27, 33, Def.'s Countercl. at ¶¶ 1–4, 21, 22), these conclusory assertions are unaccompanied by any evidence to support them. Indeed, quite to the contrary, her lengthy litigative history both in the United States and in the United Kingdom is carpeted with claims on her part of fraudulent conduct and conspiracies by a vast array of actors—including not only the TAF and its representatives, but also court personnel, judges, prosecutors and many attorneys—and a consistent array of judicial decisions have rejected these claims on a host of grounds, including their complete lack of

plaintiff originally filed this proceeding, may have lacked jurisdiction over her or was the incorrect venue, (*see* Def.'s Answer at ¶ 18; Def.'s R. 56.1 Resp. at p. 4 ¶¶ 1–2, p. 7 ¶ 10) we address these arguments below (at pp. 754–55, 769 N.Y.S.2d 402, *infra* ).

**20.** Ms. Carvel argues, as a separate matter, that the Surrogate's Court lacked jurisdiction

to rule that the 1995 Agnes Carvel will violated the 1988 will contract. (*See* Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., executed Aug. 29, 2009, ¶¶ 46–52; Def.'s R. 56.1 Resp. at ¶¶ 34–38). We address that issue below, at pp. 751–52, 765–66, 769 N.Y.S.2d 402, *infra.*

substance. *See, e.g.*, p. 739, *supra* & p. 763 n. 33, 768–69 n. 36, *infra*.

In resisting this conclusion, Ms. Carvel does assert that the High Court cost judgments in question were obtained by fraud on that court. The purported fraud, she says, involved the choice of a replacement estate representative, with the court substituting Guy Greenhous, Esq. for Ms. Carvel and appointing him as personal representative or judicial trustee of the estate. *See TAF v. PC*, [2008] Ch. at 411 ¶ 55. According to Ms. Carvel, the TAF acted fraudulently because it supposedly concealed from the court the fact that it had hired Mr. Greenhous, who was therefore "not an objective independent professional." (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶ 19). This argument fails at every level.

First, the cost judgments before us pertain to costs incurred in seeking to remove Ms. Carvel as executrix of the estate and to vacate the Chancery judgment in her favor, and do not implicate the wisdom or propriety of the choice of her replacement. Ms. Carvel does not contend, much less attempt to prove, that the High Court's determination to remove her or to vacate the Chancery judgment or to award costs to the TAF was infected by any fraud on the court. The particular choice of a replacement for her was simply not a focus of the TAF's application or of her opposition. Indeed, in its claim form addressed to the High Court, the TAF did not request appointment of Mr. Greenhous as a replacement estate administrator, mentioning only, as one possibility, "Governor Brendan Byrne" (apparently the former governor of New Jersey and member of the TAF Board of Trustees) "or some other fit and proper person". (Ticehurst Aff., Ex. A). In any event, if, as Ms. Carvel alleges, Mr. Greenhous has subsequently dealt improperly with regard to any enforceable interest that she may have—a matter to which she alludes without detail or evidence (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶ 19)—she may have a claim against him and pursue it in an appropriate forum.

Second, despite the purported concealment by the TAF, Ms. Carvel cites—for the fact of the TAF's earlier contact with Mr. Greenhous—an affidavit that Mr. Greenhous submitted to the High Court in October 2007, while the proceeding in question was still pending in the English courts. (*Id.* at ¶ 20; Def.'s R. 56.1 Resp., Ex. E). In that affidavit he alludes to having discussed his retention as Court Trustee with a representative of the TAF. (Def.'s R. 56.1 Resp., Ex. E at ¶ 11). Hence, there was notice to the English courts (and to Ms. Carvel) that Mr. Greenhous and his firm had been approached by the TAF to determine his willingness to serve as trustee, and Ms. Carvel was therefore free at that time to challenge the propriety of that appointment either on her application for leave to appeal or by application for reconsideration before the High Court.

Third, Ms. Carvel offers no indication that the TAF ever concealed from the High Court the fact that it had vetted Mr. Greenhous as a potential trustee, nor does she offer any basis for inferring that such a contact was inappropriate, since the TAF had previously and conclusively been deemed the only beneficiary of the Agnes Carvel estate. Indeed, the decision of Justice Lewison makes clear that when he decided to appoint Mr. Greenhous, he was aware that it was the TAF that was proposing his appointment. *TAF v. PC*, [2008] Ch. at 411 ¶ 55. Necessarily, then, he was aware that the TAF had previously conferred with Mr. Greenhous to determine his willingness to serve. In short, Ms. Carvel offers no evidence of any fraud on the court.

**(d)** *Repugnancy to New York Public Policy*

The claims on which the cost judgments rest are not repugnant to New York public policy, nor are the judgments themselves. The TAF sought Ms. Carvel's removal as United Kingdom executor of her aunt's estate, a step already taken by a number of American courts, which had removed her from any role in administering that estate or the estate of her uncle, based on specific findings of misconduct by her. (*See* Magoolaghan Decl., Ex. G at 7–8 (Westchester Surrogate's Court decision accepting Ms. Carvel's resignation as executrix and trustee of Thomas Carvel's estate and noting that "[h]er unwarranted actions have subjected the parties to immeasurable expense"), Ex. I at 5–6 (Eastern District decision noting restraining order preventing Ms. Carvel from taking action with regard to assets of her aunt's estate)); *In re Carvel*, 49 A.D.3d 877, 853 N.Y.S.2d 902 (2d Dep't 2008) (noting that Ms. Carvel was no longer executor of her aunt's estate). The TAF also sought vacatur of the 2003 Chancery award to Ms. Carvel, a step premised on Ms. Carvel's provable prior fraud on the court. In short, both applications were entirely consistent with American legal principles.

As for the United Kingdom cost judgments themselves, Ms. Carvel claims that they violate New York public policy because they are premised on an award of attorneys' fees against her as the losing party. This argument will not fly.

■ To avoid recognition of a foreign judgment on public-policy grounds, the defendant must satisfy a very challenging standard. In the words of the Second Circuit, as a matter of comity

> "A judgment is unenforceable as against public policy to the extent that it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought".... The

standard is high, and infrequently met. As one court wrote, "[o]nly in clear-cut cases ought it to avail defendant" ... In the classic formulation, a judgment that "tends clearly" to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy."

*Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir.1986) (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864, 866 n. 17 (D.C.Cir.1981) (citing von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 Harv. L.Rev. 1601, 1670 (1968); Paulsen & Sovern, *"Public Policy" in the Conflict of Laws*, 56 Colum. L.Rev. 969, 980–81, 1015–16 (1956))). Similarly, under New York law, to justify a refusal to recognize a foreign judgment on public-policy grounds, the opponent must establish that such recognition would be "inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." *Sung Hwan Co. v. Rite Aid Corp.*, 7 N.Y.3d 78, 82, 817 N.Y.S.2d 600, 603, 850 N.E.2d 647 (2006) (internal quotation marks omitted).

Plainly the award of costs against Ms. Carvel in this case does not remotely meet this elevated standard. Indeed, the New York courts have recognized that the fact that they do not themselves routinely award fees to the prevailing party does not make such an award "repugnant" to any public policy of the State. *See, e.g., Blits v. Renaissance Cruise Lines, Inc.*, 166 Misc.2d 497, 499–501, 633 N.Y.S.2d 933, 935–36 (Sup.Ct. Nassau County 1995) (recognizing Florida judgment despite its award of fees); *accord Blacklink Transp. Consultants PTY Ltd. v. Von Summer*, 18 Misc.3d 1113(A), 856 N.Y.S.2d 496, 2008 WL 89958, *1–6 (Sup.Ct. N.Y. County Jan. 9, 2008) (recognizing Australian judgment despite inclusion of fee award). Indeed,

New York courts do authorize fee awards pursuant to statutory provisions, including for frivolous litigation. *E.g.*, N.Y. Comp. Codes R. & Regs. Tit. 22, § 130–1.1; N.Y. Pub. Off. Law § 89(4)(c); N.Y. Dom. Rel. Law § 237. *See, e.g., Bell v. State*, 96 N.Y.2d 811, 812, 727 N.Y.S.2d 377, 378, 751 N.E.2d 456 (2001); *Beechwood Restorative Care Ctr. v. Signor*, 5 N.Y.3d 435, 443, 808 N.Y.S.2d 568, 572–73, 842 N.E.2d 466 (2005); *Bd. of Managers of Sea Breeze II Condo. v. Kwiecinski*, 72 A.D.3d 630, 898 N.Y.S.2d 461, 462 (2d Dep't 2010); *Grant v. Grant*, 71 A.D.3d 634, 634, 895 N.Y.S.2d 827, 828 (2d Dep't 2010). To cite but one circumstance comparable to that encountered here, an estate in Surrogate's Court may be awarded fees as well as other costs in the face of baseless litigation by a beneficiary or former executor. *See, e.g., Lefkowitz v. Bank of New York*, 676 F.Supp.2d 229, 240 (S.D.N.Y.2009).[21] In any event, as one New York court recently observed in rejecting the same argument as Carvel advances here, "Common-law jurisdictions have different procedural rules, some of which reflect different public policy choices. Different does not mean repugnant.... The so-called 'English rule' under which a loser pays the winner's attorneys' fees, and the usual 'American rule', under which each side bears its own attorneys' fees, reflect such choices." *Blacklink Transp. Consultants PTY Ltd.*, 2008 WL 89958 at *5. *See also Loucks v. Standard Oil Co.*, 224 N.Y. 99, 110–11, 120 N.E. 198, 201 (1918) (Cardozo, J.) ("We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.").

### (e) *Remaining Factors*

The remaining section 5304(b) provisions that would permit an exception to judgment recognition have also not been shown, even arguably, to apply. The United Kingdom cost judgments and the decision on which they are based are not in conflict with any other judgment; indeed, they are consistent with a growing body of decisions in this country that have systematically disapproved of Ms. Carvel's conduct with regard to her aunt's and uncle's estates and rejected her claims regarding the disposition of estate assets and related misconduct. (*See* Magoolaghan Decl. at ¶ 6 (describing cases)). Finally, there is also no suggestion that the parties had agreed before institution of the High Court proceeding to resolve the issues in another forum, or that the High Court was "an inconvenient forum". Indeed, on the latter point, Ms. Carvel has insisted that she be served with all papers in this and other litigations at her London residence. (*E.g.*, Stevens Aff., Ex. B—Notice of Removal at 4; Sweeting Supplemental Aff. at ¶ 5; Def.'s R. 56.1 Resp. at fifth page ¶ 2(c) & Ex. D).

### iii. *Defendant's Other Arguments*

To the extent that defendant resists the recognition of the cost judgments, she largely bypasses the statutory criteria, and relies instead on a litany of unsupported

---

**21.** As we discuss below in connection with the pending dismissal motion of the TAF and Messrs. Stevens and Griffin, Ms. Carvel's performance in dealing with the estate and with the TAF has amply merited sanctions being imposed on her, and indeed would have justified an American court in imposing fees in an equivalent proceeding to that handled by the High Court of Justice, whether under Fed.R.Civ.P. 11, 28 U.S.C. § 1927, or the inherent authority of the court (in federal court) or under N.Y. Comp.Codes R. & Regs. Tit. 22, § 130–1.1 (in a New York court). *See Margo v. Weiss*, 213 F.3d 55, 64–65 (2d Cir. 2000) (discussing Rule 11 sanctions); *Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395, 398 (2d Cir.1997) (discussing federal court's authority to award sanctions under its inherent authority or 28 U.S.C. § 1927); *Bell*, 96 N.Y.2d at 811–12, 727 N.Y.S.2d at 378, 751 N.E.2d 456 (discussing sanctions under N.Y. Comp.Codes R. & Regs. Tit. 22, § 130–1.1).

accusations of misconduct against the TAF and its representatives, including third-party defendants Stevens and Griffin. None of this saves her case.

One principal thrust of defendant's non-statutory arguments, reflected in her opposing affidavit and memorandum of law, is that she is owed more money by the TAF and counterclaim-defendant Griffin than she owes the TAF under the challenged cost judgments, apparently at least in part as a result of expenses that she allegedly incurred as a fiduciary of the Agnes Carvel trust and estate. (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶¶ 34–45). Whether that be the case or not is irrelevant to the recognition of the United Kingdom judgments. If Ms. Carvel has a potential claim for expenses—and she offers no evidence to that effect—she has had, and may still have, the opportunity to assert those claims in a proper forum, whether it be the Surrogate's Court in Westchester County or in the Florida Circuit Court or in the Delaware Chancery Court. (*See, e.g.,* Def.'s R. 56.1 Resp., Ex. F) (addressing Carvel's challenge to accounting rendered by trustees of Agnes Carvel 1991 Trust)). Moreover, if she has other viable claims against those who she claims have injured her in some way, she may obtain a judgment against them in an appropriate forum.[22] The possibility of such a future award to her, however, is not a defense to recognition of a previously entered and unrelated cost judgment. *See Lenchyshyn v. Pelko Elec., Inc.,* 281 A.D.2d 42, 49, 723 N.Y.S.2d 285, 290–91 (4th Dep't 2001) (cit-

ing *Watary Servs. v. Law Kin Wah,* 247 A.D.2d 281, 282, 668 N.Y.S.2d 458, 458 (1st Dep't 1998)) (refusing to recognize non-statutory defenses to recognition of foreign judgment). Indeed, even if Ms. Carvel had already obtained judgments against any of the other parties in this proceeding—which at present she does not have—that would not be a defense to recognition of the High Court cost judgments, but rather a potential basis for a set-off on actual recovery. *See* N.Y. C.P.L.R. § 5402(b) (noting that foreign judgment filed with county clerk "is subject to the same procedures, defenses and proceedings for reopening, vacating or staying as a judgment of the supreme court of this state"). Since, however, all that plaintiff seeks here is recognition of its cost judgments, Ms. Carvel's excursion into her probate-related grievances against the other parties is irrelevant to plaintiff's summary-judgment motion. *See generally Armada (Singapore) Pte Ltd. v. N. China Shipping Corp.,* 2010 WL 481061, *3–4 (S.D.N.Y. Jan. 14, 2010) (summarizing United Kingdom law on equitable set-offs).[23]

Ms. Carvel pursues another argument—labeled "Lack of Jurisdiction"—to the effect that the Westchester Surrogate's Court lacked jurisdiction when it decided, back in 2002, that the 1995 will of Agnes Carvel, which named Pamela Carvel as executor and the Florida Foundation as beneficiary, was void as in violation of the 1988 will contract between Agnes and Thomas Carvel. (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶¶ 46–52). The exact basis for Ms. Carv-

---

**22.** Indeed, as noted, she attempts in this lawsuit to press an array of claims against Mr. Griffin and the TAF, and to a lesser degree against Mr. Stevens. We assess those claims in our analysis of those parties' motion to dismiss.

**23.** In any event, because Ms. Carvel's purported claims for estate or trust-related ex-

penses would involve the court in supervising an accounting by the executors or trustees of the Thomas or Agnes Carvel estates or by the trustees of the Agnes Carvel 1991 Trust, those claims cannot be adjudicated here in view of the probate exception to diversity jurisdiction. *See Marshall,* 547 U.S. at 311–12, 126 S.Ct. 1735; *Lefkowitz,* 528 F.3d at 106–07.

el's assertion that the New York court lacked jurisdiction is left unclear. She merely asserts that after the death of Agnes Carvel the Surrogate's Court had no jurisdiction to address matters pertaining to the estate of either Thomas or Agnes Carvel because it did not stay the proceeding on the death of Agnes Carvel and "failed to formally substitute Agnes' executor in any proceedings." (*Id.* at ¶ 46). Based on this elusive assertion, she claims that all acts of the Surrogate since the death of her aunt "are void as a matter of law." (*Id.* at ¶ 52).

This argument is frivolous. There is no apparent factual basis (and certainly none articulated by Ms. Carvel) for challenging the jurisdiction of the Surrogate's Court in 2002 to adjudicate the application by the TAF—as the third-party beneficiary of the will contract between Agnes and Thomas Carvel—that it was entitled to the residual proceeds of the estate of Agnes Carvel. She also offers no basis—factual or legal—to challenge the 2003 decision of the Appellate Division, which affirmed the decision of Surrogate Scarpino on this issue. Moreover, even if there had been such a basis, Ms. Carvel fails to explain how a jurisdictional defect in the New York proceeding prevents recognition of the separate cost judgments rendered by the High Court of Justice based solely on the fact that the English court alluded to, and relied in part on, Surrogate Scarpino's finding that the 1995 will of Agnes Carvel was in violation of the prior will contract and that the TAF was the residual beneficiary of the Agnes Carvel estate.

■ Giving defendant's argument the most charitable reading that we can, she may be understood to argue that the English court should not have relied on the Surrogate's Court's decision, and that the conclusion of the High Court was thus erroneous. Even if we assumed that there were a basis for such a criticism of the High Court's decision—and we see absolutely none in the record—that would not justify denying recognition to the United Kingdom judgments. Challenges to the merits of a foreign-court decision do not provide a basis under the New York statute or comity standards to justify denying recognition to a foreign judgment. *Blacklink Transp. Consultants PTY Ltd.*, 2008 WL 89958, at *6 ("On a motion seeking recognition and enforcement of a foreign country money judgment, it is not for the New York court to question the underlying merits of the judgment."). *Accord Porisini v. Petricca*, 90 A.D.2d 949, 950–51, 456 N.Y.S.2d 888, 890 (4th Dep't 1982) (noting that review of merits of action is foreclosed to recognition court once it establishes that foreign court had jurisdiction to enter judgment). In short, this form of argument by Ms. Carvel is entirely baseless.

The penultimate section of defendant's opposing affidavit consists of a broad-based attack on the honesty of Messrs. Stevens and Griffin and the conduct of the TAF. In this section, labeled as "Unclean Hands", Ms. Carvel alludes to the TAF not being the real Carvel Foundation but rather "an identity thief", accuses Mr. Stevens of being a "perjurer", asserts that the TAF operates "a criminal enterprise" designed to deny Ms. Carvel control of "Carvel assets" and to convert them to Mr. Griffin's control, claims that the Hudson Valley Bank (of which Mr. Griffin is the chairman (Magoolaghan Decl., Ex. A—Aff. of William E. Griffin in Supp. of Mot. to Dismiss, executed Oct. 8, 2007, ¶ 4)) bribed Surrogate Scarpino to cover up the "theft" of Carvel property, insists that "agents" of the TAF have transferred "large sums" to the TAF in derogation of Ms. Carvel's claims (apparently against the estate of Agnes Carvel) and accuses Mr. Griffin of looting the TAF assets by transferring them to the Hudson Valley Bank, in purported violation of a Surrogate's Court

order preserving assets to cover estate expenses. (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶¶ 53–59).

The short answer to this diatribe is that it is devoid of any evidentiary support.[24] The slightly longer response to her argument is that it is irrelevant to the recognition of a money judgment in favor of the TAF and against Ms. Carvel. If she has colorable claims against the TAF or anyone affiliated with it, she is free to assert such claims in an appropriate forum, an opportunity of which she has not been shy to avail herself in the past (or indeed in this litigation). That does not translate into a defense against registration of the unrelated foreign cost judgments.

■ The notion of unclean hands is available to defend against claims in equity, see, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Kallman v. Krupnick, 67 A.D.3d 1093, 1097, 891 N.Y.S.2d 490, 494 (3d Dep't 2009), but must rest on proof of misconduct relating directly to the claim in question. Precision Instrument Mfg. Co., 324 U.S. at 814–15, 65 S.Ct. 993. Ms. Carvel proffers no evidence of misconduct by the TAF in connection with the United Kingdom proceeding, and in any event we note

that she was free to raise an unclean-hands defense in the High Court to oppose the entry of judgment. If she did—and the record is not clear on this—the court there plainly rejected the argument, and we have no basis to second-guess that determination. If she did not make such an argument there, she cannot now raise it here as, in effect, a collateral attack on the cost judgments in question.

Ms. Carvel ends her affidavit with the assertion that res judicata precludes the TAF from opposing her counterclaims. This assertion is supposedly based in part on the effect of the Westchester County Surrogate's 2002 decision—ironically, the very one that rejected her claim of entitlement to the residual estate assets and that she asserts was issued as a result of bribery of the court by Mr. Griffin and his bank. (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶ 60). Whatever may be the impact of that decision, it plainly does not assist Ms. Carvel in seeking to resist the TAF's application for recognition of the United Kingdom cost judgments. Likewise, Ms. Carvel's cryptic reference to a Florida Court of Appeal decision, presumably the one attached as exhibit F to her Rule 56.1 response, is unavailing. (Id.). That decision merely addressed a summary-judgment motion

---

24. For example, in purported support of Ms. Carvel's claim that the Hudson Valley Bank (and presumably Mr. Griffin) bribed Surrogate Scarpino, she cites to a document—exhibit C to her Rule 56.1 Response—which is dated February 18, 1992 and appears to constitute a discussion among personnel of the TAF about a forthcoming meeting with the New York State Attorney General. It contains no indication of a payment of a bribe to anyone, it does not mention Surrogate Scarpino, and its only reference to the Surrogate's Court is the statement that as to one issue—labeled "Loans"—"Surrogate Court will decide." (Def.'s R. 56.1 Resp., Ex. C at p. 2).

In another section of Ms. Carvel's Rule 56.1 response she asserts that the TAF paid over

$400,000 to Westchester Surrogate's Court judges, although the evidence that she cites for that claim has not been introduced in the record of this case. (Def.'s R. 56.1 Resp. at ¶ 32). She has submitted evidence that Surrogate's Court judge Anthony Scarpino and his wife obtained mortgages from Hudson Valley Bank, but clearly the fact that a bank whose chairman is the president of the TAF (Magoolaghan Decl., Ex. A—Griffin Aff. at ¶ 4) offered a judge a home mortgage on what appears to be standard terms cannot support Ms. Carvel's extraordinary allegations of bribery. (App. to Carvel Aff. in Opp'n to Dismissal and Sanctions, A17–011001 SCARPINO $200K LOAN, A25–041230 SCARPINO $100K LOAN). See also infra p. 763 n. 33.

pertaining to an accounting of the Agnes Carvel 1991 Trust, which in no way influences the propriety of the cost judgments that have been issued against Ms. Carvel. (Def.'s R. 56.1 Resp., Ex. F).

Accompanying Ms. Carvel's affidavit is her response to plaintiff's Rule 56.1 Statement. In view of her status as a *pro se* litigant (though hardly an inexperienced one), we have reviewed that document as well for any additional arguments that she may be pressing to oppose the TAF summary-judgment motion, and have found a few possible theories, which we also address.

Ms. Carvel asserts that, contrary to the allegations of the plaintiff's pleading, she does not reside at a New York address, and she seems to suggest that—apart from its pertinence to plaintiff's honesty—this alleged misstatement shows that venue for the plaintiff's state action was improperly found to lie in New York County. (Def.'s R. 56.1 Resp. at fourth page ¶¶ 1–2). Such an argument, if that is what she intends, does not provide a basis for us to reject recognition of the cost judgments that have been entered against her.

First, the record contains evidence that Ms. Carvel does in fact maintain a residence in New York County. (Magoolaghan Reply Decl., at ¶ 11). If that is true then, under New York law, New York County would have been a proper venue for the TAF's action. *See* N.Y. C.P.L.R. § 503(a) (noting that venue is proper in the county of residence of any party).

However, even if Ms. Carvel does not reside in New York County—in which case the only proper venue under New York law for the TAF's claim would have been the county of plaintiff's residence, Westchester County—Ms. Carvel's removal of the action to federal court renders any objection to venue premised on New York law moot. Once a case has been removed from state to federal court, venue for the action is governed by federal law, which identifies the "district and division embracing the place where such [removed state] action is pending" as the proper location. 28 U.S.C. § 1441(a). *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 72 (2d Cir.1998) (citing *Polizzi v. Cowles Magazines, Inc.,* 345 U.S. 663, 665, 73 S.Ct. 900, 97 L.Ed. 1331 (1953)). As plaintiff's claim was undeniably pending in New York County at the time it was removed, venue for the removed case is proper in this court. (*See* Stevens Aff., Ex. B—Notice of Removal at first page).[25]

■ Alternatively, we could interpret Ms. Carvel's possible objection to the venue of plaintiff's state-court action, based on a dispute about her residence in New York, to be in effect an argument that New York lacked personal jurisdiction over her. However, such a contention would be meritless in the context of plaintiff's request for recognition of a foreign judgment. New York need not have personal jurisdiction over a litigant to recognize a foreign judgment against her, because the purpose of recognizing the judgment is merely to allow the creditor

**25.** Of course, Ms. Carvel could have moved to transfer this case to another federal district court after removal, under either 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406(a), or moved to dismiss the case under the doctrine of *forum non conveniens. PT United Can Co. Ltd.,* 138 F.3d at 72–73; *Hollis v. Florida State Univ.,* 259 F.3d 1295, 1300 (11th Cir.2001). However, the record contains no evidence of any

such a motion having been made, much less a basis for it.

Ms. Carvel was also free to move to transfer venue in the state court case prior to removal. *See* N.Y. C.P.L.R. § 510. *E.g., Kuzmin v. Nevsky,* 51 A.D.3d 639, 640, 858 N.Y.S.2d 254, 254–55 (2d Dep't 2008). However, there is no evidence in the record that she availed herself of this opportunity.

to reach the debtor's assets in New York. *Lenchyshyn,* 281 A.D.2d at 47–50, 723 N.Y.S.2d at 289–91 (citing cases). *See generally* N.Y. C.P.L.R. § 5403, David D. Siegel, Practice Commentaries C5403:2 at 581–82 (McKinney's 1997).

Moreover, even if personal jurisdiction over Ms. Carvel were required, there is evidence in the record to suggest that she was properly served and chose to appear generally, and that, as a matter of due process, she has had sufficient contacts with this jurisdiction growing out of the transactions that gave rise to the very judgments at issue here to establish personal jurisdiction over her in New York. *See Frontera Res. Azerbaijan v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393, 396 (2d Cir.2009) (discussing requirements for *in personam* jurisdiction). In terms of Ms. Carvel's contacts with New York, the evidence indicates that she has a residence and phone number in New York which she, at a minimum, has used in the past. (Magoolaghan Reply Decl. at ¶¶ 9–11). Additionally, as noted, Ms. Carvel accuses her adversaries of stealing estate property in which she has an interest by transferring it to the Hudson Valley Bank, which is located in Yonkers, in this district. (*E.g.,* Def.'s R. 56.1 Resp. at ¶ 24).

In any event, to the extent that Ms. Carvel may have property here, the Supreme Court's recognition of *quasi in rem* jurisdiction as consistent with due-process requirements in a debt-collection case, *see Shaffer v. Heitner,* 433 U.S. 186, 210 n. 36, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), would likely enable a court in this state to assert jurisdiction over the parties for present purposes. *See* N.Y. C.P.L.R. § 5403, David D. Siegel, Practice Commentaries C5403:2 at 581–82 (McKinney's 1997). *Accord Lenchyshyn,* 281 A.D.2d at 48, 723 N.Y.S.2d at 289–90.

The balance of defendant's 56.1 Response repeats in large measure, and occa-sionally greater detail, the grounds that she presses in her affidavit for non-recognition. (*E.g.,* Def.'s R. 56.1 Resp. at ¶¶ 5, 8–9, 11, 26–28). She also refers to irrelevant legal sources, including Rule 60(b), the Equal Protection Clause, the Uniform Fraudulent Transfer Act and the European Human Rights Act, and rehearses her assertion that she is owed substantial sums by the Agnes Carvel estate. (*See generally* Def.'s R. 56.1 Resp. at ¶¶ 5, 27). None of these allusions provides a basis to decline to recognize the High Court cost judgments.

In short, there are no triable disputes as to the facts material to plaintiff's application for recognition of the High Court of Justice cost judgments. Accordingly, the plaintiff's motion for summary judgment should be granted.

## V. The TAF's and Third–Party Defendants' Motion to Dismiss

The TAF and third-party defendants Stevens and Griffin have moved to dismiss Ms. Carvel's claims against them on a variety of grounds. These include failure to comply with pleading standards under Rules 8(a), 12(b)(6) and 9(b), as well as res judicata or collateral estoppel and, in some respects, a lack of subject-matter jurisdiction.

### A. Rule 8(a), 12(b)(6) & 9(b) Standards

We start by noting the standards that the movant must meet in order to obtain dismissal for failure to state a claim. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *accord, e.g., Triest-*

man v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir.2006). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir.2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions or "legal conclusions couched as factual allegations". See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n. 1, 321 (2d Cir.2010) (citing Ashcroft v. Iqbal, —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (addressing Rule 8(a)) and quoting Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007)).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Leibowitz v. Cornell Univ., 445 F.3d 586, 590 (2d Cir.2006) (quoting Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Supreme Court has recently rejected this formulation, however, and hence a complaint is now subject to dismissal unless its factual allegations, if credited, make the claim "plausible". See Iqbal, 129 S.Ct. at 1949; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560–61, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The court thus must look to the well-pled factual allegations and determine whether, if true, those allegations would permit a reasonable inference that the defendant is liable. See, e.g., Iqbal, 129 S.Ct. at 1949–50. While the Supreme Court's recent decisions do not require a party to plead "detailed factual allegations" to survive a motion to dismiss, they do require that " 'the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defen-

dant is liable for the misconduct alleged' ". Starr, 592 F.3d at 321 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955; Iqbal, 129 S.Ct. at 1949). In any event, however, "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. Iqbal, 129 S.Ct at 1949. In short, the pleading must do more than "tender[ ] naked assertions devoid of further factual enhancement", id. (internal quotation marks omitted), and in doing so must " 'raise a right to relief above the speculative level.' " ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). Moreover, this requirement applies to the pleadings of pro se plaintiffs. See, e.g., Sheehy v. Brown, 335 Fed.Appx. 102, 104 (2d Cir.2009); Carvel v. Cuomo, 357 Fed.Appx. 382, 383–84 (2d Cir.2009) (invoking Twombly plausibility standard); Dorsey v. Fisher, 2009 WL 4985421, *2, *4 (N.D.N.Y. Dec. 15, 2009); Conseillant v. Lafontant, 2009 WL 2163263, *1 (N.D.N.Y. July 20, 2009).

When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent. Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., ATSI Commc'ns, Inc., 493 F.3d at 98; Roth v. Jennings, 489 F.3d 499, 509 (2d Cir.2007); Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir.1999). Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions. See, e.g., Anderson v. Rochester-Genesee Reg'l Transp. Auth., 337 F.3d 201, 205 n. 4 (2d Cir.2003); Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86–87 & nn. 3–4 (2d

Cir.2000); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) (court can take judicial notice of document filed in another court "to establish the fact of such litigation and related filings") (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *Sure–Snap Corp. v. State St. Bank and Trust Co.,* 948 F.2d 869, 872–73 (2d Cir. 1991) (taking judicial notice of bankruptcy court findings to determine their preclusive effect); *Lefkowitz v. Bank of New York,* 676 F.Supp.2d at 238–39 & n. 1 (taking judicial notice of Surrogate's Court and state Supreme Court findings and decisions); *Dewees v. Legal Servicing, LLC,* 506 F.Supp.2d 128, 130–31 & n. 1 (E.D.N.Y.2007) (taking judicial notice of New York City Civil Court judgment).

As for the requirements of Rule 9(b), it imposes a more stringent pleading regime than does Rule 8 on certain types of claims. Pertinent to the defendants' pending motion, it requires, for all fraud allegations, that the pleader must "state with particularity the circumstances constituting fraud". Fed.R.Civ.P. 9(b). To comply with this requirement, " 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Moreover, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally", Fed.R.Civ.P. 9(b), if the claim is one for fraud the pleader must nonetheless " 'allege facts that give rise to a strong inference of fraudulent intent.' " *Lerner,* 459 F.3d at 290 (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)).

## B. Res Judicata and Collateral Estoppel Criteria

Since the movants also seek dismissal in part based on the preclusive effects of other court decisions—principally those of the Surrogate's Court, the Appellate Division and other New York courts—we also summarize the standards applicable to the res judicata and collateral estoppel defenses that they assert. As a federal court before which the TAF and Messrs. Griffin and Stevens invoke state-court rulings as a bar to litigation of some of the claims now before us, we must look to how the state courts that rendered those rulings would treat these defenses. *E.g., Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999).

New York has adopted a transactional approach to claim preclusion, also referred to as res judicata. Thus, " 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' " *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (quoting *Allen,* 449 U.S. at 94, 101 S.Ct. 411). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158 (1981). *See Smith v. Russell Sage Coll.,* 54 N.Y.2d 185, 192, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746 (1981) (noting that res judicata applies where different legal theories of relief are grounded on the same "congeries of facts", even when the different legal theories " 'depend on different shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief' ") (quoting *Restatement (Second)*

*of Judgments* [Tent. Draft No. 5], § 61, cmt. c)), *reh'g denied,* 55 N.Y.2d 878, 448 N.Y.S.2d 1026, 433 N.E.2d 537 (1982).

 This principle does not afford a defense, however, if the initial forum lacked the authority to grant the full measure of relief sought in the later litigation. *See Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 265 (2d Cir.1997); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Res judicata also does not apply if " 'formal jurisdictional or statutory barriers' " previously prevented the plaintiff from " 'presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law.' " *Jacobson,* 111 F.3d at 265 (quoting *Burgos,* 14 F.3d at 790).

 As for issue preclusion, or collateral estoppel, under New York law it

> precludes a party from relitigating in a subsequent action or proceeding an issue *clearly raised* in a prior action or proceeding and decided against that party ..., whether or not the tribunals or causes of action are the same. The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.

*Leather,* 180 F.3d at 425 (emphasis and alteration in original; internal quotation marks omitted) (quoting *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 482, 712 N.E.2d 647 (1999)). *See Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000); *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487 (1984).[26]

 The collateral-estoppel doctrine applies irrespective of whether the tribunals or causes of action in the two proceedings are the same. *See Sullivan,* 225 F.3d at 166. Moreover, the parties in the two proceedings need not be identical. Rather, the defense may be invoked by " 'a nonparty to a prior litigation ... [whose] own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or [are] derivative of, the rights of the party to the prior litigation.' " *Juan C. v. Cortines,* 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 585, 679 N.E.2d 1061 (1997) (quoting *D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 27, 564 N.E.2d 634 (1990)).

 The party invoking collateral estoppel must demonstrate the identity of the issues in the prior and current litigations and must establish that the issues were previously decided on the merits. The party seeking to defeat the application of the defense has the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior action. *See Warney v. McMahon, Martine & Gallagher,* 1998 WL 575188, *3 (S.D.N.Y. Sept. 9, 1998) (citing *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63 (1985)). *Accord Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir.1997).[27]

---

**26.** In contrast to claim preclusion, which bars the litigation of claims that could have been raised in a prior lawsuit, issue preclusion bars the relitigation of issues actually raised and decided in the prior proceeding, as long as that determination was essential to the prior judgment. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995).

**27.** To the extent that the movants' papers may be read as also relying on the preclusive effect of Florida state-court rulings, we note that Florida law on res judicata and collateral estoppel substantially parallels that of New York. *See, e.g., AMEC Civil LLC v. Fla. Dep't of Transp.,* 41 So.3d 235, 238–43 (Fla. 1st Dist. Ct.App.2010); *Ritch v. State,* 14 So.3d 1104, 1107 & n. 5 (Fla. 1st Dist.Ct.App.2009).

## C. *Pamela Carvel's Allegations*

Ms. Carvel's pleading of her claims, in a document titled "PAMELA CARVEL'S ANSWER, AFFIRMATIVE DEFENSES & COUNTERCOMPLAINT", names the TAF as well as Messrs. Griffin and Stevens as defendants. The narrative, found in the section denominated "COUNTER-CLAIM/COUNTERCOMPLAINT" (hereafter "Counterclaim") is sparse and almost entirely conclusory, but seems to say principally, and more or less in order, (1) that the Agnes Carvel estate and the TAF owe Pamela Carvel vast amounts of money, ranging from $16 million to $300 million (Countercl. at ¶ 1); (2) that the TAF is a phony foundation, having "stole[n] the identity of the Carvels' legitimate charity" through "documented forgery and fraud", although Ms. Carvel does not specifically identify which is the "legitimate charity", much less the nature of the fraud (*id.* at ¶ 2)[28]; (3) that Mr. Griffin, apparently in league with others, has stolen large portions of the assets of the Agnes Carvel estate (*id.* at ¶ 3), and used some of those funds to bribe judges and lawyers "to aid and abet the written fraudulent intent to transfer all Carvel family assets away from the control of the Carvel family as rightful asset owners" (*id.* at ¶ 2); (4) that bribery by Mr. Griffin and others also triggered the refusal of the trustees of the Agnes Carvel 1991 Trust to honor Pamela Carvel's claims for compensation from the estate of more than $18 million in expenses that she had borne (*id.* at ¶ 5); (5) that the trustees of the Agnes Carvel trust failed to account to Ms. Carvel on an annual basis (*id.* at ¶ 7); (6) that she filed claims for $16 million against the "ancillary administration" of her aunt's estate but those claims were ignored by the Surrogate because he had been bribed by Griffin (*id.* at ¶¶ 8–9); (7) that the lawyers for the Agnes Carvel estate ignored her claims because they too had been bribed (*id.* at ¶ 10); (8) that Pamela Carvel was deprived of approximately $300 million in proceeds from the sale of Carvel Company stock—money that Agnes Carvel had assigned to Pamela Carvel but that Griffin "fraudulently diverted into his control without notice to Pamela" (*id.* at ¶ 11); (9) that all proceedings in the Westchester Surrogate's Court are "null and void" because of (a) a lack of notice to all interested parties, (b) an absence of jurisdiction over those parties, and (c) a failure by the probate court to stay proceedings until Pamela Carvel was substituted as executor and "personal representative" of Agnes Carvel (*id.* at ¶ 12); (10) that Pamela Carvel is the beneficiary of a contract between Thomas and Agnes Carvel that the Surrogate has recognized (*id.* at ¶ 13); and (11) that Agnes Carvel assigned Pamela Carvel various assets that defendant Griffin then improperly took and that should have been, but were not, returned to the estate under Surr. Ct. Proc. Law § 2215 to be used to pay expenses. (*Id.* at ¶¶ 14–18).

As for the legal basis of plaintiff's claims, Ms. Carvel is vague, although she

---

We note that it is possible to interpret Florida's res judicata standard as employing a somewhat more narrow transactional test than New York's. *See Tyson v. Viacom, Inc.*, 890 So.2d 1205, 1209 (Fla. 4th Dist.Ct.App. 2005) (noting that res judicata only bars subsequent action when facts underlying prior action are identical, such that doctrine would not bar breach of employment contract claim based on prior whistleblower claim). However, we need not determine the extent of any potential variation in the respective states' standards, as it does not prove determinative in this case.

**28.** We infer, however, that she is referring to her own Carvel Foundation, Inc., and thus is seeking, in effect, to recycle the argument—previously rejected by the Surrogate's Court and the Appellate Division and later by other courts—that the 1995 will of Agnes Carvel was consistent with the Carvels' will contract.

mentions purported violations of her rights under the Uniform Fraudulent Transfer Act (as adopted in New York and Florida), and under the First, Fifth and Fourteenth Amendments to the United States Constitution. (*Id.* at ¶¶ 21–23). We infer that she is also asserting a range of common-law claims against the TAF and Messrs. Griffin and Stevens. For relief, Ms. Carvel seeks payment of her claims from assets controlled by the TAF and Griffin, an order setting aside various unspecified "fraudulent transfers" by Griffin—apparently of real estate—and an award of "treble punitive damages". (*Id.* at ¶ 19 & "Wherefore" clause at pp. 12–13).

### D. *Assessment of Movants' Dismissal Motion*

The TAF and Messrs. Griffin and Stevens assert four broad bases for dismissal of Ms. Carvel's claims. First, they contend that plaintiff's rambling and conclusory allegations do not satisfy the pleading requirements of Fed.R.Civ.P. 8(a). (Mem. of Law in Supp. of Countercl. Defs.' Mot. to Dismiss the Countercls. and for Sanctions ("Countercl. Defs.' Dismissal Mem."), 5–7). Second, they invoke the probate exception to diversity jurisdiction to argue that most or all of the claims fall outside this court's subject-matter jurisdiction. (*Id.* at 7–8). Third, they argue that almost all of the claims are barred by res judicata or collateral estoppel based on prior court decisions of which this court may take judicial notice. (*Id.* at 8–10). Fourth, they assert that if any claims survive Rule 8(a) and the other grounds for dismissal, they nonetheless fail for lack of standing (the identity-theft allegation against the TAF) or for an absence of a legal basis for the purported claims. (*Id.* at 10–13).

In assessing the dismissal motion, we have reviewed not only Ms. Carvel's pleading, but also all of her motion papers, including a substantial collection of miscellaneous documents provided by her on a compact disc labeled Appendix. Even with the aid of those added submissions, we conclude that the arguments for dismissal are generally well-merited.

■ The bulk of plaintiff's allegations consist simply of conclusory assertions that various unnamed individuals, as well as defendant Griffin, have engaged in illegal or fraudulent behavior involving the assets of the Agnes Carvel estate, the funds of the TAF, and the *bona fides* of the TAF, and that they have conspired in some way to prevent Ms. Carvel from being reimbursed for her estate-related expenses and from collecting huge sums that represent either assets supposedly assigned to her by her aunt or unidentified legal claims that she has against the TAF, Mr. Griffin and others.[29] These assertions are pitched at such a level of generality that they offer little or no indication of what the factual basis is for the labels that plaintiff affixes to them. Moreover, to the extent that she seems to allege that Griffin and others engaged in fraud, her allegations fail in all respects to comply with the requirements of Fed.R.Civ.P. 9(b). Furthermore, to the extent that some of these claims are even remotely recognizable, facts of which we may take judicial notice demonstrate their lack of basis. As a separate matter, to the extent that Ms. Carvel is complaining about the disposition of estate assets, her claims have repeatedly been adjudicated by various courts, including notably in the Westchester County Surrogate's Court. Moreover, some of those claims are barred by the probate exception to diversity jurisdiction. As for her other claims of misconduct by the de-

---

**29.** Ms. Carvel mentions defendant Stevens only in alleging that, as counsel to the TAF, he has acted unethically in unspecified respects. (Countercl. at ¶ 4).

fendants or others, these too have been addressed in one form or another by other courts and have been rejected.

We briefly address each of Ms. Carvel's series of allegations of misconduct or entitlement. All are legally deficient.

Insofar as Ms. Carvel alleges that she is owed between $16 million and $300 million—the lower figure apparently reflecting expenses that she claims to have incurred for the Agnes Carvel estate and the larger apparently representing assets supposedly transferred to her by Agnes Carvel—the complaint is devoid of any stated factual basis. Thus, it fails under both Rule 8(a) and 12(b)(6). Moreover, any claims for expenses incurred by Ms. Carvel as a fiduciary of the estate or for debts otherwise incurred by the estate to her have either already been heard in the Florida, New York and Delaware courts or can be raised in those ongoing proceedings. *See* Magoolaghan Decl., Ex. L—Aff. of Steven J. Fink, Esq., in Supp. of Defs.' Mot. to Dismiss Carvel's Del. Compl., executed Oct. 9, 2007, ¶ 8 (noting Florida probate court's decision that Ms. Carvel is not entitled to reimbursement of attorneys' fees from estate assets); *Thomas and Agnes Carvel Found. v. Carvel*, 2008 WL 4482703, *14 n. 117 (Del.Ch. Sept. 30, 2008), *aff'd*, 970 A.2d 256, 2009 WL 714958, *1 (Del. Mar. 19, 2009) (denying Ms. Carvel's request for litigation expenses in connection with Delaware litigation and declining to appoint successor administrator due to lack of estate assets in Delaware). Similarly, a trial on the accounting in Agnes Carvel's ancillary estate proceeding has recently been held in the Westchester County Surrogate's Court, and presumably

Ms. Carvel was given the opportunity to present any pertinent claims to that court. Hence, these expense claims are barred from being heard here by the probate exception to diversity jurisdiction, *see Marshall*, 547 U.S. at 311–12, 126 S.Ct. 1735 (probate exception precludes federal court from disposing of property in custody of state probate court), and as a matter of res judicata or collateral estoppel.[30] As for Ms. Carvel's claim of entitlement to the proceeds of Carvel stock—apart from being insufficiently pled—it is plainly barred by the prior finding of the Surrogate's Court that the TAF, not Ms. Carvel, is the residual beneficiary of the Agnes Carvel estate. *In re TAF*, 2002 WL 32872391, at *3–4, *9–10.

Carvel's reference to identity fraud by the TAF fails for various reasons. She offers no factual basis for the claim, thus falling short under Rules 8(a) and 12(b)(6). The lack of adequate details (or indeed any detail) also dooms this claim under Rule 9(b). Furthermore, Ms. Carvel offers no basis for inferring that she has any standing to assert such a claim. The Surrogate's Court and other state and federal courts have determined that Ms. Carvel is not the residual beneficiary or a fiduciary of the estates of Thomas or Agnes Carvel. Necessarily, then, she cannot demonstrate any personal injury from the asserted identity theft. Since injury is an essential and constitutionally mandated element of standing, *see, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the claim fails for this reason as well.

In addition, the same "identity fraud" claim has been pressed by Ms. Carvel in

---

**30.** At one point Ms. Carvel claims that the probate exception cannot apply because this lawsuit was originally filed in state court. (Carvel Aff. in Opp'n to Dismissal and Sanctions, ¶ 11). This argument is nonsense. Ms. Carvel removed the case to federal court on the basis of diversity jurisdiction, and then

asserted her counterclaims and third-party claims. She cannot assert claims premised on diversity and at the same time ignore the absence of such jurisdiction to hear her claims in this court. (*See* Def.'s Answer at ¶ 18 (explaining basis for counterclaim plaintiff invoking court's diversity jurisdiction)).

other proceedings and rejected, thus barring her reassertion of such a claim here. Indeed, that very point was most recently made by the Delaware Court of Chancery in 2008, when it granted an application by the TAF to remove Ms. Carvel as Delaware ancillary administrator of the Agnes Carvel estate. In unsuccessfully resisting that application, Ms. Carvel asserted, among other defenses, that the TAF was an imposter as the residual beneficiary of the estate and hence lacked standing to seek the relief that it requested. In rejecting that argument, the court applied the Delaware law of collateral estoppel against Ms. Carvel, based on the 2002 decision of the Westchester Surrogate's Court holding that the TAF was in fact the third-party beneficiary of the Carvel will contract and hence the residual beneficiary of the Agnes Carvel estate. *See Thomas & Agnes Carvel Found.*, 2008 WL 4482703, at *4–6, *aff'd*, 970 A.2d 256, 2009 WL 714958, at *1. The Delaware court further cited the 2006 order of the Broward County Circuit Court, which vacated the prior registration of the 2004 Chancery judgment that Ms. Carvel had obtained against her aunt's estate in London. In so holding, the Florida court had recognized that the TAF was an "interested party" in the proceeding before it—a finding necessary to its decision and one based on the 2002 Surrogate's Court decision. *Id.*, 2008 WL 4482703, at *6 (citing Magoolaghan Decl., Ex. M—*In re Recognition of Foreign Judgment: Carvel v. Estate of Carvel*, Case No. 05–5762(09), Order at 4 (Fla.

17th Cir.Ct. Jan. 31, 2006) (holding that Surrogate's Court 2002 decision precluded attack on the TAF's *bona fides* and standing)). The Delaware court also cited the finding of the High Court of Justice in 2007 that the TAF had been entitled to notice of the prior Chancery judgment obtained by Ms. Carvel since it was the residual beneficiary of the estate. *Id.*

Ms. Carvel next accuses some mostly unidentified individuals, and perhaps the TAF, of bribing the judges who ruled against her in the many cases that she has lost. The one specifically articulated allegation in this respect is that Mr. Griffin or someone on his behalf (and acting for either the TAF or the Hudson Valley Bank) bribed Surrogate Scarpino. This assertion is made without the slightest factual grounding, and for this reason alone cannot be deemed a plausible claim within the meaning of *Iqbal* and *Twombly*.[31] As the Second Circuit has noted, under the pertinent Supreme Court precedent "[the] pleader [must] amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Ms. Carvel's bribery claim—which reflects an attempt to avoid the effect of a prior court decision later upheld on appeal and followed by various other courts—is surely a claim that demands application of such an amplified-pleading requirement, and yet she fails to provide it.[32]

---

**31.** As noted, Ms. Carvel cites as support for her accusation of a bribe being paid to Surrogate Scarpino, a document that provides no reference to any such payment or indeed any reference at all to Surrogate Scarpino. (Def./Countercl. Pl.'s Aff. and Mem. of Law in Opp'n to Summ. J., at ¶ 55 (citing Def.'s R. 56.1 Resp., Ex. C)). To the extent that Ms. Carvel's bribery claim is based on mortgage

documents that Ms. Carvel has proffered, it is in no way plausible. *See supra*, p. 753, n. 24.

**32.** Indeed, a review of the nature of the underlying claims that Ms. Carvel has pursued in other courts, as well as the judicially noticeable record of her gross misconduct in seeking court rulings, amply establish that these conclusory accusations are likely to be transparent fabrications.

It also bears noting that Ms. Carvel has used these same bribery allegations as a basis for seeking to preclude reliance by other courts on the Surrogate's 2002 decision holding that the TAF was the residual beneficiary of the Agnes Carvel estate. Those courts have uniformly rejected her efforts. *See, e.g.,* Magoolaghan Decl., Ex. M at 4 (Florida court observed, in rejecting Ms. Carvel's contention that the 2002 decision was procured by fraud, "Petitioner participated in the proceedings and either she failed to raise the argument of fraud or, if she did raise the argument, she did not prevail either at trial or on appeal. Therefore, Petitioner cannot now make the argument that the decision rendered by the Westchester Surrogate's Court was obtained by fraud."); *Thomas and Agnes Carvel Found.,* 2008 WL 4482703, at *9 (rejecting Ms. Carvel's collateral attack on Surrogate's Court decision by bribery allegations). These rulings are both persuasive and preclusive of Ms. Carvel's claim.[33]

Insofar as Ms. Carvel complains about the trustees of the Agnes Carvel 1991 Trust not providing annual accountings to her, her claim fails for multiple reasons. First, she pleads no basis to establish that she was entitled to any accountings during whatever time period is relevant, since she was apparently not a beneficiary of the trust. Second, she fails to plead a basis for standing, since she alleges no facts that could plausibly indicate any injury caused to her by the lack of an accounting. Third, the request for an accounting with respect to the testamentary trust appears to be within the exclusive jurisdiction of the Florida probate court, which would trigger the probate exception to diversity jurisdiction. *See, e.g., Marshall,* 547 U.S. at 311, 126 S.Ct. 1735 (probate exception reserves to state probate courts the administration of a decedent's estate); *Lefkowitz,* 528 F.3d at 106 (probating will or addressing the status of assets in executor's control is covered by probate exception).

Ms. Carvel also complains that she was owed $16 or $18 million in expenses by the Agnes Carvel estate and that the Surrogate ignored that claim. However, she has had the opportunity to seek reimbursement for expenses in the Westchester County probate court, which has in fact granted a portion of her requests.[34] More-

---

**33.** We further note that Ms. Carvel has been pursuing the same allegation of a bribe to Surrogate Scarpino by Mr. Griffin and others in at least one separate lawsuit in this court. That claim was initially dismissed by Judge Scheindlin, and after a remand from the Second Circuit, she dismissed it again, albeit with leave to attempt to replead. *See Esposito v. New York,* 2008 WL 3523910, *5, *12–14 (S.D.N.Y. Aug. 8, 2008), *aff'd in part & vacated in part sub nom. Carvel v. New York,* 369 Fed.Appx. 269, 270 (2d Cir.2010), *dismissed on remand,* 2010 WL 1404154, *2–4 (S.D.N.Y. Apr. 6, 2010). The claim as articulated here is no more legally tenable than in that case, but in any event we see no basis to allow Ms. Carvel to litigate the same claim in two different courtrooms.

**34.** Although Ms. Carvel does not specify the time period in which she incurred these asserted expenses, we note that a 2003 decision by Surrogate Scarpino awarded Ms. Carvel's attorneys $400,000.00 for services that had been rendered to the Agnes Carvel estate through December 31, 2002, to be paid from the Agnes Carvel 1991 Trust, in response to Ms. Carvel's application for payment of expenses of her aunt's estate. Order dated July 30, 2003 in *Application of Pamela Carvel,* File No. 2165/1998 (Sur. Ct. Westchester County 2003). We also note that the Surrogate awarded Ms. Carvel's attorneys $500,000.00 for services that they rendered to the Thomas Carvel estate through April 30, 2004. Order dated December 29, 2004 in *Petition of McCarthy Fingar LLP to Fix and Determine its Compensation for Services Rendered to Pamela Carvel,* File No. 3285/1990 (Sur. Ct. Westchester County 2004). Although Ms. Carvel was suspended as a co-executor of her uncle's estate in 1995, the Surrogate determined that some of her subsequent actions in connection with her aunt's estate benefitted her uncle's estate as well, and thus her attorneys were entitled to reimbursement of a portion of their fees from her uncle's estate. *Id.* at 2–3.

over, we understand that a trial on the accounting in Agnes Carvel's Westchester County ancillary estate proceeding has recently concluded and a decision from the Surrogate is pending. Presumably Ms. Carvel was afforded the opportunity to present her request for reimbursement as part of that proceeding. In addition, we note that Ms. Carvel has already had an opportunity to present her claims for reimbursement in the pending Florida and Delaware probate proceedings, and she is bound by the decisions that have been issued by those courts. Magoolaghan Decl., Ex. L at ¶ 8 (noting Florida decision that plaintiff is not entitled to reimbursement of attorneys' fees from estate assets); *Thomas & Agnes Carvel Found.*, 2008 WL 4482703, *3–4, *12 (summarizing proceedings in ongoing Delaware Agnes Carvel estate case, including motion by Pamela Carvel for an interim accounting by ancillary administrator; court denies relief to Pamela Carvel for lack of standing and absence of estate property in Delaware that could justify an accounting).

In any event, probate proceedings pertaining to Agnes Carvel's estate are ongoing. *See* Palm Beach County Clerk & Comptroller, Docket Report Search, http://courtcon.co.palm-beach.fl.us/pls/jiwp/ck_public_qry_doct.cp_dktrpt_setup_idx (search by Case ID for "501995CP003258XXTRIY") (last accessed May 3, 2010); New Castle County Delaware Register of Wills, Will Search, http://www.nccde.org/willsearch/Search/default.

aspx (Search for "Agnes Carvel") (last accessed May 3, 2010). *See also* Letter to the Court from Joan Magoolaghan, Esq., dated Mar. 31, 2010, attaching Mar. 19, 2010 Order in *In re Agnes Carvel 1991 Trust: Godley v. Greenhous,* Case No. CP–95–3258IY (Fla. 15th Cir.Ct. Mar. 19, 2010) (sanctioning Ms. Carvel in ongoing accounting proceeding by Agnes Carvel 1991 Trust co-trustees). The probate exception to diversity jurisdiction thus applies to Ms. Carvel's expense claim since it precludes the use of the federal courts as a forum for a collateral attack on the rulings of a surrogate's court in allocating the assets and income of an estate, or for interfering with a pending probate proceeding. *Marshall,* 547 U.S. at 311, 126 S.Ct. 1735; *Lefkowitz,* 528 F.3d at 106.

Plaintiff makes a similar complaint about the lawyers for the estate, that is, that she was owed $16 million and that the estate attorneys failed to arrange to reimburse her. Again, these are matters within the exclusive province of the probate courts and, to the extent that Ms. Carvel has chosen or will choose to raise them there, the respective courts' determination of these issues will be binding on her.[35] In any event, she has not named the estate attorneys as defendants in this lawsuit and hence could not obtain relief in this case for their asserted inaction.

Ms. Carvel's assertion that she was owed approximately $300 million that Agnes Carvel had supposedly assigned her—in the form of proceeds from the sale

---

**35.** At one point Carvel appears to complain that she was not given notice of the probate proceedings in Westchester. *See* Countercl. at ¶ 12 (arguing that the Westchester Surrogate's Court proceedings are void, in part, because notice of the proceedings was not given to all parties with an interest in Agnes Carvel's estate). This assertion is obviously false. She was one of the original executors of the Thomas Carvel estate, and when the issue of Agnes Carvel's status and her actions in transferring assets and arranging for the execution of the 1995 will were presented to the probate court, Pamela Carvel appeared there through counsel and in fact was a witness at the trial before Surrogate Scarpino. *See In re TAF,* 2002 WL 32872391, at *3–4, *5–6 (noting Ms. Carvel's appearance by counsel, describing her testimony and rejecting her interpretation of the Carvel will contract).

of Carvel Corporation stock—is equally subject to dismissal. Again, this allegation is purely conclusory, consisting of the assertion that Pamela Carvel's aunt had assigned her all of this money at some unstated time and in some unstated manner, and that Mr. Griffin had somehow "fraudulently diverted it" to himself. The absence of specific allegations reflects a lack of sufficient detail to satisfy basic pleading standards as well as the requirement of plausibility, and a failure as well to comply with the more specific fraud pleading criteria of Rule 9(b).

The claim also fails because, even if Agnes Carvel had made such an assignment (presumably after 1988) her act was barred by her will contract with Thomas Carvel. Indeed, the basis for this conclusion follows from the Surrogate's Court holdings (1) that the documented 1994 transfer by Agnes and Pamela Carvel of approximately $2 million in assets from the Thomas Carvel testamentary trust to their own account was improper, and (2) that the 1995 Agnes Carvel will was invalid because it purported to assign assets to the Florida Foundation, in violation of the requirement in the Carvels' 1988 will contract that all marital assets, except for specified bequests, be retained (net of living expenses for Agnes) for distribution to the TAF on Agnes Carvel's death. *See* Magoolaghan Decl., Ex. F at 3, Ex. G at 2, 8; *In re TAF*, 2002 WL 32872391, at *4, *10.

In short, under the Surrogate's Court's 2002 holding—affirmed by the Appellate Division and later adhered to by courts in Florida, Delaware and the United Kingdom as well as in New York—Agnes Carvel could not transfer such assets to Pamela Carvel. In substance, then, Ms. Carvel's claim here is simply an effort by her to relitigate the Surrogate's 2002 decision, but she is precluded from doing so by principles of collateral estoppel.

Carvel's next assertion is that the Westchester County Surrogate's decisions are "null and void" for various obscurely described procedural reasons, including lack of notice to interested parties, lack of jurisdiction and failure by the court to stay its own proceedings. We read this set of allegations liberally as seeking declaratory relief, but there is no basis for such relief. She fails to allege any factual basis for questioning the decisions of the Surrogate—primarily, we infer, the 2002 order deeming the 1995 Agnes Carvel will unenforceable—and in any case her objections to the 2002 decision were addressed, as they had to be, to the Appellate Division, which affirmed. *See In re Carvel*, 2 A.D.3d at 847–48, 769 N.Y.S.2d at 402–03. She fails to state a claim here, and in any event this court does not sit as an appellate body to review decisions of the state courts. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (*Rooker–Feldman* doctrine prevents losing party in state-court lawsuit from alleging injury to federal rights from state-court decision issued prior to commencement of federal proceeding and inviting district court review of state-court decision). *Accord Lance v. Dennis*, 546 U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006).

Carvel next makes the peculiar assertion that she is a third-party beneficiary of a contract between Thomas and Agnes Carvel and that the Surrogate has recognized that contract afforded Agnes Carvel the unfettered ability to dispose of all of her income. She does not identify the contract to which she refers or what it entitles her to, a plain failing of pleading. Moreover, the only agreement between the Carvels with which we are familiar is the will contract of 1988, which the Surrogate in fact held was enforceable in favor of the TAF and precluded any assignment of assets to Ms. Carvel. *In re TAF*, 2002 WL

32872391, at *9–10. That decision, affirmed by the Appellate Division, and followed by other courts, is preclusive of any claim of the sort pressed by Pamela Carvel.

Finally, Ms. Carvel recycles her assertion that her aunt assigned her some property—though unidentified, we assume it is the previously mentioned alleged $300 million in Carvel Corporation stock proceeds—and that Mr. Griffin somehow stole it. For reasons already noted, this claim cannot fly both because Ms. Carvel pleads no specific facts on which to premise a plausible claim, and because Agnes Carvel was prevented by the will contract from assigning such assets to her niece, a conclusion reached by the Surrogate's Court and the Appellate Division, as well as by other judicial bodies.

In sum, the motion by the TAF and Messrs. Griffin and Stevens to dismiss the counterclaims and third-party claims of Ms. Carvel should be granted. Moreover, in view of the complete meritlessness of the claims pressed by Ms. Carvel, as well as her extraordinary history of baseless litigation here and in various state and foreign courts, we recommend that, contrary to the common practice of allowing a plaintiff the opportunity to replead if there is a possibility that she may be able to formulate a litigable claim, *see, e.g., Porat v. Lincoln Towers Cmty. Ass'n,* 464 F.3d 274, 276 (2d Cir.2006), the dismissal here should be with prejudice. There simply is no prospect that further pleading would rescue Ms. Carvel's case.

### VI. *The Sanctions Motion of the TAF and Messrs. Griffin and Stevens*

Plaintiff and the third-party defendants ask that the court exercise its inherent authority to impose sanctions on Ms. Carvel for bad-faith litigation. They seek an award of their costs of this litigation, which we infer would include reimbursement of attorneys' fees. For the reasons that follow, we recommend that this application be granted in part.

The court "has 'inherent power' to award attorneys' fees against the offending party ... when it determines a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Agee,* 114 F.3d at 398 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs,* 776 F.2d 383, 390 (2d Cir.1985)). To impose such sanctions, the court must determine that there is "clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." *Id.* (citing cases). *Accord, e.g., Wolters Kluwer Fin. Servs., Inc. v. Scivantage,* 564 F.3d 110, 114 (2d Cir.2009); *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 336 (2d Cir.1999). In assessing such a request we recognize, as the Second Circuit recently observed, that " [b]ecause of their very potency, inherent powers must be exercised with restraint and discretion.' " *In re Kalikow,* 602 F.3d 82, 97 (2d Cir.2010) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Consistent with that admonition, the court's finding that a claim is without a colorable basis-that is, that it "lacks any legal or factual basis"—"must be supported by a high degree of specificity", as must a finding of bad faith or an improper purpose. *Wolters Kluwer Fin. Servs., Inc.,* 564 F.3d at 114. The fact that the targeted party is a *pro se* litigant does not immunize her from the consequences of violating court rules or other legal standards, although a litigant's financial status is a pertinent consideration in assessing whether to impose monetary sanctions and in what amount. *See, e.g., DiGianni v. Stern's,* 26 F.3d 346, 349 (2d Cir.1994); *Sassower v. Field,* 973 F.2d 75, 80–81 (2d Cir.1992); *PSG Poker,*

*LLC v. DeRosa–Grund,* 2009 WL 2474683, *3–4 (S.D.N.Y. Aug. 13, 2009).

In this case we focus on Ms. Carvel's assertion of claims against the TAF and Messrs. Griffin and Stevens, rather than on her role as a defendant in the context of the judgment-recognition proceeding. In doing so, we note that it is not entirely clear whether the movants' request for sanctions is intended to target Ms. Carvel for her opposition to the TAF's request for judgment recognition as well as her affirmative pursuit of claims against them. Although her opposition to the recognition of the High Court's cost orders is plainly meritless, we do not ascribe to her in this respect the bad faith that is a prerequisite for exercise of the court's inherent authority to impose sanctions. After all, she is in the position of seeking to avoid having her property attached to satisfy those orders, and hence her efforts to resist recognition are underpinned by a frequently encountered motivation, although she plainly does not have the law or the facts on her side.

As for Ms. Carvel's affirmative case, for reasons already noted, her claims here are entirely without merit as a matter of law. Moreover, we conclude that she is pursuing these claims for an improper purpose.

Although plaintiff is appearing *pro se,* her litigation history reflects that she is not at all unsophisticated, and thus we infer that she has an understanding of the groundless nature of most or all of her claims. We further note that her prior history in dealing with the estates of her uncle and aunt, with the TAF, and with numerous individuals who have represented those entities in a variety of capacities clearly demonstrates that she has an utter disregard both for legal constraints and for basic factual accuracy. That state of mind, amply reflected in her current papers, fully justifies our finding that she has acted in this case in bad faith and for an improper purpose, that is, to pursue her multi-decade efforts to obtain a large portion of the estates of her aunt and uncle, to which she is plainly not entitled, and, failing that, to impose groundless legal and cost burdens on those individuals who have resisted her efforts at misappropriation.

In reaching the conclusion that Ms. Carvel is acting in bad faith and for an improper purpose, we first look to her past conduct. As noted, after the death of her uncle, she arranged with her ageing aunt to transfer assets from the estate to a personal account in her own name as well as that of her aunt, in plain violation of her fiduciary responsibilities. She then oversaw her aunt's move to London and her preparation of a new will that left all of Agnes Carvel's residual estate to the Florida Foundation, which was Pamela Carvel's own creation—a step that plainly violated the terms of the will contract between Thomas and Agnes Carvel. As executor of the Thomas Carvel estate, Pamela Carvel was obviously aware of the terms of that contract and was clearly seeking to evade it by subterfuge. Moreover, by that time her aunt was under a disability, and when the Surrogate's Court sought to verify her status, Ms. Carvel apparently persuaded her aunt not to make herself available for evaluation by the Surrogate, contributing to the Surrogate's decision to accept Ms. Carvel's resignation as an executor of her uncle's estate, a position from which she had been suspended at the very time that her aunt resigned as executor of Thomas Carvel's estate. (*See* Magoolaghan Decl., Ex. F at 3–4, Ex. G at 3–4).

Ms. Carvel's efforts to evade the terms of the will contract and to obtain access to her uncle's and aunt's assets proceeded apace when her aunt died in 1998. Using the 1995 will as a fulcrum, she obtained appointment in the United Kingdom as executor and then contrived a plainly manufactured lawsuit in the High Court by which she sought and obtained a huge

judgment against the estate, all without notice to the parties—notably the TAF—that she knew had an interest in the estate assets. The history of her attempt then to use that collusively obtained judgment in the United States—seeking and obtaining registration in Florida (again without notice) and then here in Nassau County (rather than in Westchester, where her scam would presumably have been promptly recognized), followed by a quick effort to seize assets in the custody of financial institutions—amply establishes her larcenous motives and deceptive practices in seeking to get her hands on estate assets. To similar effect was her attempt in 2006 to register the United Kingdom judgment in the Eastern District of New York, all the while not mentioning that she had previously been prevented from enforcing that judgment by Florida and New York state courts, in part based on the courts' determination that the judgment was the product of fraud. (Magoolaghan Decl., Ex. I, Ex. M at 5, Ex. N).

Our conclusion about Ms. Carvel's approach is also borne out by the earlier rulings of a host of courts. Those courts have universally rejected her claims either on the face of the pleadings or upon discovery of the true facts, and they have repeatedly found Ms. Carvel guilty of attempting to perpetrate a fraud on those courts. (*See, e.g.*, Magoolaghan Decl., Ex. E at [2008] Ch. at 410 ¶ 51, 411 ¶ 57 (United Kingdom decision removing Ms. Carvel as personal representative of Agnes's United Kingdom estate on the inference

that she did not understand her representative responsibilities and was unwilling to learn them, and setting aside her judgment from the estate), Ex. I at 5 (Eastern District decision dismissing Ms. Carvel's attempt to register the United Kingdom judgment and describing her claim as an attempt to commit the same fraud on the court as she did in the Florida Circuit Court), Ex. M at 5 (Florida decision vacating recognition of United Kingdom judgment and finding "strong evidence of a fraud upon the court perpetrated by [Ms. Carvel] in both the proceedings before the High Court and this Court")). We further note that, to a large extent, her recent litigation efforts have been in evident violation of the restraining orders issued in late 2005 by the Westchester County Surrogate's Court and the Nassau County Supreme Court.

To the extent that Ms. Carvel's efforts to seize estate assets have been frustrated, she has also used the litigation process as a means of launching unfounded, and often defamatory, attacks on a host of targets. Indeed, the frequency of these efforts and their repetitive nature—as well as the utter baselessness of her allegations—indicates a pattern of seeking either to extort a surrender of assets to her or, failing that, to punish those who have frustrated her designs. We cite below only a portion of the lawsuits that she has recently pursued on the basis of generalized and unsupported allegations of wrongdoing by individuals drawn into the outer ring of her war on the estates and the TAF.[36]

36. In recent years Ms. Carvel has filed numerous, often-repetitive cases in the New York state courts, in Delaware, in Florida, in the Southern District of New York, in the Northern District of New York, in the Southern District of Florida and in the District of Delaware. See for example:

— Magoolaghan Decl., Ex. L—Fink Aff. at ¶¶ 10–13 (reciting some of the lawsuits that Pamela Carvel has filed);

— Magoolaghan Decl., Ex. T—Compl. in *Carvel v. Godley*, 09 Civ. 1156(SCR) (S.D.N.Y.2009)(accusing dozens of defendants, including fiduciaries, lawyers, bankers and judges, of criminal conduct, racketeering and conspiracy to steal Carvel assets from the Carvel family through Hudson Valley Bank);
— Magoolaghan Decl., Ex. P—Decision & Order in *Carvel v. Cuomo*, 07 Civ. 1034 (LEK/RFT) (N.D.N.Y. Aug. 26, 2008) (dismissing complaint alleging racketeering and con-

Ms. Carvel's claims in this case are consistent with that pattern. They are, as noted, plainly legally baseless and in most respects rest on demonstrably false factual allegations, and are larded with groundless accusations of gross misconduct against individuals with professional responsibilities regarding the estates, trusts or foundations of her aunt and uncle. In short, they are of a piece with much of her other litigation. Furthermore, she extends the scope of her attack by challenging the honesty of opposing counsel, again a tactic that seems familiar from her history, and which lacks any evident basis.

In sum, we conclude that the record amply justifies cost-shifting insofar as plaintiff and the third-party defendants have had to defend against plaintiff's claims. The award should include not only

stitutional violations based on State Attorney General not investigating corruption at the TAF and seeking its dissolution), *aff'd*, 357 Fed.Appx. 382 (2d Cir.2009);

— *Carvel v. Ross*, 09 Civ. 722(LAK) (S.D.N.Y.2009) (suit against Surrogate and various estate-related attorneys (including Ms. Carvel's former counsel), based on claims of conspiracy to steal Carvel family property and legal malpractice, partly dismissed under Rule 4(m) (*see* Magoolaghan Decl., Ex. W));

— *Carvel v. Griffin*, 07 Civ. 273 (D.Del.2007) (suit accusing Griffin and others connected with the TAF and Hudson Valley Bank of criminal conduct, racketeering and fraud designed to steal Carvel family assets; complaint falsely alleges that 1995 Agnes Carvel will was never challenged and remains in effect)(*see* Magoolaghan Decl., Ex. B);

— *Carvel Estate ex rel. Carvel v. Ross*, Civil Action # 07–238 (D.Del.2007), *dismissed in part*, 566 F.Supp.2d 342 (D.Del.2008) (suit by Ms. Carvel as purported ancillary administrator of Agnes Carvel estate against Mr. Ross, the New York appointed attorney for the same estate, alleging racketeering, fraud and conspiracy to steal Carvel family assets; motion to dismiss claim against defendant Ross granted for lack of personal jurisdiction, remainder of case terminated);

— *Carvel v. Andreas Holdings Corp.*, Civil Action # 14520 (Del. Ch.2008), stayed, 698 A.2d 375 (stay in case disputing stock ownership in deference to Westchester Surrogate's proceeding on accounting of estate) (*see* Magoolaghan Decl., Ex. H). Apparently the stay in this proceeding was never lifted. (*See* Magoolaghan Decl., Ex. L at ¶ 17);

— *In re Final Accounting of the Estate of Agnes Carvel*, 07 Civ. 3504(RMB) (S.D.N.Y. May 4, 2007) (removed estate accounting proceeding remanded as removal was untimely) (*see* Magoolaghan Decl., Ex. P);

— *Esposito v. New York*, 2008 WL 3523910 (S.D.N.Y. Aug. 8, 2008), *aff'd in part & vacat-*

ed in part sub nom. Carvel v. New York*, 369 Fed.Appx. 269 (2d Cir.2010), *dismissed on remand*, 2010 WL 1404154 (S.D.N.Y. Apr. 6, 2010) (suit against New York Attorney General, state court judges and various Carvel fiduciaries, alleging corruption and conspiracy; Ms. Carvel's claims dismissed with leave given to replead);

— *see also Carvel v. Franchise Stores Realty Corp.*, 08 Civ. 8938(JGK) (suit alleging defendants failed to pay rent on property for which Agnes Carvel allegedly assigned a lease, and asserting, *inter alia*, breach of contract, fraud, RICO, tort and civil-rights claims), 2009 WL 4333652 (S.D.N.Y. Dec. 1, 2009) (dismissing all but portion of breach-of-contract claim), *reconsideration denied*, 2010 WL 691935 (S.D.N.Y. Mar. 1, 2010). Ms. Carvel has filed an "interlocutory appeal" of this decision to the Second Circuit;

— *see also Carvel v. Godley*, 95 Civ. 8591 (S.D.Fla.1995) (suit filed in Florida state court and removed, against trustees of Agnes Carvel 1991 Trust; Ms. Carvel claimed, *inter alia*, breach of fiduciary duties and sought accounting; she voluntarily dismissed claims in December 1995 and counterclaim was remanded in November 1996) (*see* Magoolaghan Decl., Ex. K). Ms. Carvel removed the case over a decade later, but it was subsequently remanded (*see* Magoolaghan Decl., Ex. Y);

— *see also Carvel v. Ferncliff Cemetery*, 07 Civ. 60584 (S.D.Fla.2007) (suit against New York cemetery to exhume body of Thomas Carvel to test for possible homicide; claim dismissed) (*see* Magoolaghan Decl., Exs. U & Z).

out-of-pocket disbursements, but reasonably engendered attorneys' fees.[37]

### VII. *The Request for an Injunction*

The TAF and Messrs. Griffin and Stevens also seek an injunction from this court either limiting or precluding Ms. Carvel's ability to continue filing lawsuits involving issues of estate assets or seeking to enforce the vacated High Court judgment. They do not clearly state what injunctive provisions they are seeking, although they quote the temporary restraining order issued by the Westchester County Surrogate, which prohibited Ms. Carvel from

> (1) taking any action in another court pertaining to or affecting the assets and property of the Estate [of Agnes Carvel], subject to the jurisdiction of this Court, including all assets and property of said Estate that are located in the State of New York, (b) taking any action to enforce the purported Judgment obtained by Pamela Carvel with regard to assets and property of the Estate [of Agnes Carvel], or (c) taking any action which interferes with [the executor's] possession, custody and control of the funds, assets or property of the Estate recovered by him or over which he has custody or control for the benefit of the Estate and/or (d) from representing to any entity that she has legal authority to act on behalf of the Estate in the State of New York.

(Magoolaghan Decl. at ¶ 35 & Ex. I (quoting *Carvel v. Carvel Found. Inc.*, Memorandum & Order at 5–6 (E.D.N.Y. Mar. 29, 2006) (quoting order of Westchester County Surrogate's Court))).

The Second Circuit has long recognized the authority of the federal courts to control the behavior of litigants who have "a history of filing 'vexatious, harassing or duplicative lawsuits'" through "restrictions on future access to the judicial system." *Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir.2005) (quoting *Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir.2005); *Safir v. United States Lines, Inc.*, 792 F.2d 19, 24 (2d Cir.1986)). *Accord In re Martin–Trigona*, 9 F.3d 226, 228–29 (2d Cir.1993). Thus, the court retains the equitable power to place appropriate restrictions on the ability of a litigant to pursue repetitive and abusive lawsuits in the future. *See, e.g., In re Martin Trigona*, 737 F.2d 1254, 1261–64 (2d Cir.1984). *Accord, e.g., Bridgewater Operating Corp. v. Feldstein*, 346 F.3d 27, 30 (2d Cir.2003); *Colida v. Nokia Inc.*, 2008 WL 4517188, *13–16 (S.D.N.Y. May 6, 2008). In assessing the propriety of such injunctive relief, we are to look to (1) the plaintiff's history of litigation and particularly whether it reflects a pattern of "vexatious, harassing or duplicative lawsuits"; (2) the plaintiff's motives in pursuing the litigation, including particularly whether she has a reasonable and good-faith basis for expecting to prevail; (3) whether she is represented or *pro se;* (4) whether the plaintiff's conduct has caused "needless expense" to other litigants or imposed an "unnecessary burden on the courts"; and (5) whether other

---

**37.** We note that we are to take Ms. Carvel's financial status into account when determining the amount of any sanction imposed on her as a *pro se* litigant. *See Sassower,* 973 F.2d at 81. Although we do not have any detailed information regarding Ms. Carvel's current financial status, beyond her assertion that she is proceeding in this matter *pro* se due to a lack of funds for hiring counsel, we note that she has not claimed, in her opposition, that she would be unable to pay any sanctions that might be imposed on her. Regardless, as we are not currently fixing the amount of the sanction award, but merely recommending that sanctions be imposed, we view an evaluation of Ms. Carvel's financial status as a matter best left to another day.

remedies would suffice to serve the goals of an injunction. *Safir*, 792 F.2d at 24. *Accord, Bridgewater Operating Corp.*, 346 F.3d at 30.

The record before us amply justifies some form of injunctive relief as requested by the movants. That record confirms in overwhelming fashion the compulsion of Ms. Carvel to file repetitive lawsuits in various courts for purposes that are inconsistent with the principles governing civil litigation in the federal courts. *See In re Sassower*, 510 U.S. 4, 5, 114 S.Ct. 2, 126 L.Ed.2d 6 (1993); *Bridgewater*, 346 F.3d at 30; *In re Martin–Trigona*, 592 F.Supp. 1566, 1569–76 (D.Conn.1984). Indeed, the proceedings that she has launched are the epitome of "vexatious, harassing [and] duplicative lawsuits". Moreover, for reasons already noted, any rational litigant in Ms. Carvel's position would certainly have understood that her claims are legally meritless both because they have been rejected by numerous other courts and because they are grounded on provably false statements or material omissions by her. As for Ms. Carvel's motives in pursuing this course, we have already reviewed that question in assessing the sanctions issue, and have concluded that the only reasonable inference is that she seeks to appropriate property to which she is not entitled and, in the alternative, to impose unjustified litigation burdens on those whom she deems responsible for the frustration of her efforts in this regard. Finally, her course of conduct has imposed extensive and entirely unjustified burdens on the targets of her campaign, and has equally saddled the courts with a healthy crop of frivolous litigation.

■ In sum, we conclude that this court would be entirely justified in entering an injunction against her.[38] As for its terms, we suggest a prohibition against her filing in the Southern District without prior court permission any lawsuits that concern the management or distribution of assets within the custody or control of the estates or trusts of Thomas or Agnes Carvel or the fiduciaries of those estates or trusts.[39] We see no need (or basis) to add—along the lines of the Surrogate's

---

**38.** We note that Ms. Carvel has been afforded notice and an opportunity to be heard regarding this injunctive request, as the request was made in a September 17, 2009 filing, to which Ms. Carvel responded on September 24, 2009. This satisfies the due-process standard necessary for the imposition of an anti-filing injunction. *See Colida*, 2008 WL 4517188, at *14.

**39.** Such an order could read as follows:

Plaintiff is hereby permanently enjoined from filing any new lawsuit against any defendant in the Southern District of New York that arises from or seeks to affect the disposition of any assets in the custody or control of any fiduciaries of the estates or trusts of Thomas Carvel or Agnes Carvel without first obtaining leave of court in accordance with the following conditions:

(A) Plaintiff shall file with the complaint of any new action a motion captioned "Motion Pursuant to Court Order Seeking Leave to File";

(B) Plaintiff shall attach, as an exhibit to the motion, a copy of this order;

(C) Plaintiff shall also attach, as an exhibit to the motion, an attestation under penalty of perjury that she has

(i) complied with Rule 11 of the Federal Rules of Civil Procedure; and

(ii) has complied with the conditions of this injunction;

(2) Any initial filing that does not include an attestation that complies with the requirements of subdivision (C) shall be summarily dismissed pursuant to the terms of this injunction; and

(3) Any initial filing that does not comply with the terms of this injunction may subject plaintiff to sanctions and/or citation for contempt of court.

*See, e.g., Colida*, 2008 WL 4517188, at *16 (citing *In re Martin–Trigona*, 737 F.2d at 1262–63).

injunction—a prohibition on her making representations in New York State that she has authority to act for the Agnes Carvel estate. The Surrogate's Court has already so ordered, and that order apparently remains in effect. Moreover, the documented misconduct by Ms. Carvel that is of concern here involves the filing of lawsuits rather than representations made in other contexts.

The movants' injunction request is not specific as to whether it seeks an order limiting or precluding the filing of similar cases in state court as well as in this court. In any event we view such a possible injunctive order as inappropriate as well as unnecessary. In *In re Martin–Trigona*, 737 F.2d at 1263, the Second Circuit held that the district court had erred in extending its blanket injunction of Martin–Trigona to his filings in state court. The Circuit recommended, instead, that in the "spirit of cooperative federalism," Martin–Trigona be required to "alert state courts to [his] past activities so they may take judicial notice of matters relevant to new litigation brought by him," and that, to do so, he should be compelled to append pertinent informational materials concerning his blanket injunction in the federal courts to any future filings in the state courts. *Id.* We recommend that the district court adopt, as part of an injunctive order, language enjoining plaintiff's litigation of trust or estate-related issues in this court, and adopt the same notice requirements as were imposed on Martin–Trigona with regard to state-court filings.[40]

### VIII. *Ms. Carvel's Sanctions Request*

As noted, apart from resisting the motion to dismiss her claims, Ms. Carvel asks that sanctions be imposed on the TAF and Messrs. Griffin and Stevens. It is self-evident, in light of our prior discussion, that this application is baseless and should be denied.

### *CONCLUSION*

For the reasons stated, we recommend that the TAF's motion for summary judgment on its application for recognition of the High Court's cost judgments be granted; that the motion of the TAF and Messrs. Griffin and Stevens to dismiss the counterclaims and third-party claims of defendant Pamela Carvel be granted; that the TAF and Messrs. Griffin and Stevens be awarded their costs, including reasonable attorneys' fees, as against Ms. Carvel for their defense against her claims; that these parties' application to enjoin Ms. Carvel from further, similar court filings be granted to the extent noted; and that the application of Ms. Carvel for sanctions against the plaintiff and third-party defendants be denied. Finally, we recommend that defendant Carvel Foundation, Inc. be dismissed from the lawsuit.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. *See also* Fed.R.Civ.P. 6(a), 6(d). Such the undersigned, Room 1670, U.S. Courthouse, 500 Pearl Street, New York,

---

**40.** In making this recommendation we recognize that plaintiff currently still has several pending cases in this district and in the Second Circuit. *See, e.g.,* dockets in *Carvel v. Godley,* 09 Civ. 1156 (S.D.N.Y.2009); *Carvel v. Ross,* 09 Civ. 722 (S.D.N.Y.2009); *Carvel v. New York,* 08 Civ. 3305 (S.D.N.Y.2008); *Carvel v. Franchise Store Realty Corp.,* 08 Civ. 8938 (S.D.N.Y.2008). (*See also* Magoolaghan Decl., Ex. J (listing federal cases in which Ms. Carvel is a party that have been filed between January 2004 and August 2009)). The proposed relief would not affect those lawsuits both because it is addressed to future filings and because it is limited to lawsuits that seek to affect assets in the custody of the Carvel estates or trusts or their fiduciaries.

New York 10007. Failure to file timely objection may constitute a waiver of those objection both in the District Court and on later appeal to the United States Court of Appeals. *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 150–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).